746 P.2d 997

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Edward CURRINGTON, Defendant-Appellant.**

**Edward CURRINGTON, Petitioner-Appellant,**

v.

**STATE of Idaho, Respondent.**

**Nos. 15094, 15815.**

Court of Appeals of Idaho.

Oct. 30, 1987.

Petition for Review Denied Feb. 25, 1988.

Edward B. Odessey (Ada County Deputy Public Defender), Boise, for petitioner-appellant.

Jim Jones, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

Early one morning a fire occurred at the Boise home of Edward Currington. Subsequently, Currington was charged with and convicted of first-degree arson, *see* I.C. § 18–801, and of damage to and destruction of insured property with the intent to defraud the insurer. *See* I.C. § 41–1326.

The jury also found Currington to be a "persistent violator," under I.C. § 19–2514. The district judge sentenced Currington to an indeterminate fifteen-year period in the custody of the Idaho Board of Correction.[1] Currington appealed from the judgment. While that appeal was pending, Currington filed an application with the district court for post-conviction relief. The application was denied and Currington also appealed from that order. Both appeals are now before us, having been consolidated. For the reasons set forth below, we vacate the judgment and direct that Currington be granted a new trial.

Currington's appeals present the following issues: (1) whether his oral statements included in a tape recording introduced at trial were procured in violation of his right to the assistance of counsel and, therefore, were not admissible; (2) whether his trial counsel's failure to move to suppress the recording constituted a failure to provide effective assistance; (3) whether remarks regarding Currington's race during the prosecutor's closing argument deprived Currington of a fair trial; (4) whether the state's loss of certain evidence deprived Currington of due process; (5) whether the state knowingly offered false testimony at trial; and (6) whether the verdict was supported by substantial evidence. We conclude that the tape recording was erroneously admitted. We address the remaining issues only to the extent they are likely to arise at a new trial.

The few uncontested facts are as follows. In June of 1982, Currington was purchasing a home in Idaho. His wife and child had recently moved to an out-of-state residence. Currington was unemployed, was having difficulty paying his debts, and had filed for relief under Chapter 13 of the Bankruptcy Code. At approximately four o'clock a.m., on June 16, 1982, one of Currington's neighbors awoke to the sound of breaking glass. Upon discovering Currington's home ablaze, the neighbor contacted the fire department. The fire heavily damaged the interior and contents of Curring-ton's home. Investigators concluded that the fire was incendiary in origin. Currington subsequently was charged with arson.

At trial, the state asserted that Currington was motivated by his financial straits to attempt to defraud his insurer. The state alleged that Currington either started the fire or encouraged someone else to do so. The state offered a panoply of circumstantial evidence. Firefighters described the fire. A series of investigators opined that the fire was the result of arson, and could not have resulted from other causes. An insurance agent for a company other than the one that insured the home testified that Currington had inquired about the potential recovery in case of a fire. Another witness testified that Currington had voiced the idea of burning the residence in order to avoid foreclosure. Testimony and documentary evidence were presented regarding Currington's financial status. Other witnesses testified that Currington had removed furniture and photographs from his home, shortly before the fire.

The state also proffered two witnesses who placed Currington at a restaurant when the fire was reported. The first was the restaurant manager. The second was a companion of Currington's, named Cochran, who described their activities on the night in question, including their breakfast together at four o'clock, a.m., the same time as the fire. Apparently Cochran had become acquainted with Currington some months earlier while trying to collect a debt owed by Currington to a third party. Cochran testified that Currington previously had offered him $4,000 to burn the home, and that he had declined the offer. Following the fire, an anonymous threatening note claiming responsibility for the fire was found on Currington's vehicle. Cochran testified that he wrote this note at Currington's request.

Cochran also was instrumental in the presentation by the state of certain incriminating oral statements made by Currington. After Currington was arraigned, Cochran allegedly approached the prosecut-

---

1. Because the district court concluded that the two crimes arose from the same act, no punishment was imposed for the insurance fraud. *See* I.C. § 18–301.

ing attorney's office and claimed that Currington had been threatening him and his family. According to Cochran, an investigator in that office provided him with a tape recorder and phone attachment so recordings could be made of any subsequent threats. One of the resulting recordings was of a conversation between Currington and Cochran. Although not containing threats, a copy of the recording was introduced at Currington's trial by the state because it contained other incriminating statements. The tape was admitted over Currington's objections and was played to the jury. During closing argument, the prosecuting attorney summarized the tape and prepared it for playback by the jury during their deliberations.

At trial, Currington denied the allegation of arson. He called an expert witness who offered a contrary opinion regarding the cause of the fire. Currington also disputed the evidence connecting him to the fire. His attorney argued that the state's evidence was far from conclusive. The state's witnesses, as well as those who testified for Currington, placed him in a location other than his home at the time of the fire. The state offered no evidence regarding who actually set the fire. Nor was any evidence of time-delay devices introduced. His attorney noted that Currington had taken steps to reorganize his financial affairs, which ran counter to the state's motivation theory and accounted for a sale by Currington of furniture he had removed from his home.

## I

Because we find it to be dispositive, we immediately turn to the admission of the recorded telephone conversation between Currington and Cochran. Currington contends that this recording was obtained in violation of his Sixth Amendment right to counsel and was, therefore, improperly admitted. He cites *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and later United States Supreme Court cases.

## A

The right to assistance of counsel in a criminal prosecution is a fundamental right made applicable to the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963). This right is also embodied in our state constitution. *See* Idaho Const., article 1, § 13.

In *Massiah*, the government surreptitiously utilized the services of a codefendant, as an informant, to obtain incriminating statements from an indicted defendant who had retained counsel and had been released on bail. When statements were made by the defendant to the informant, counsel was not present. The United States Supreme Court held that the defendant's Sixth Amendment right to counsel was violated "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. The Court concluded that because such statements had been elicited in contravention of the defendant's rights, they were not admissible at trial. However, as the Court explained, this exclusionary rule does not bar the continuing investigation of the suspected criminal activities of the defendant. "All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." 377 U.S. at 207, 84 S.Ct. at 1203 (emphasis original).

In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court faced the question whether the government had "deliberately elicited" statements from a defendant in custody when the statements were made to an informant who had been instructed not to ask questions. There, the informant and the defendant had been placed in a cell overlooking the scene of the crime. The informant was specifically instructed *not* to initiate any conversation with, nor to

question, the defendant. The prosecution contended that the defendant's statements were not "elicited" by the government and thus, were admissible under *Massiah*.

The Court rejected this argument. The Court noted that the informant was not simply a passive listener, but had conversed with the defendant, and that these conversations produced the incriminating statements. The Court focused upon three factors which brought the case within the *Massiah* rule. First, the informant was paid and was acting under the instructions of the government. Second, the informant represented himself to the defendant as no more than a fellow inmate. Third, the defendant was in custody and under indictment. The Court emphasized the surreptitious nature of the government's acts, and the psychological inducement "to reach for aid" inherent in confinement.[2] Further, the Court noted that the conversants were more than mere acquaintances, and that the informant had gained Henry's confidence. *Id.* at 274, note 12, 100 S.Ct. at 2189, note 12. The Court concluded that the government had intentionally created a situation "likely to induce" the defendant to make incriminating statements without the assistance of counsel, and that this act violated the defendant's right to counsel. *Id.* at 274, 100 S.Ct. at 2189.

Two recent United States Supreme Court cases have refined the *Massiah* rule. In *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), a divided court resolved two significant issues: (1) whether *Massiah* applies even if the defendant arranges the meeting during which the incriminating statements are made; and (2) whether a "good-faith" exception to the rule exists, predicated on other, legitimate reasons for the surveillance, such as continuing investigation of criminal activities. There, a codefendant approached state au-

thorities because he had received anonymous threats. The police provided him with a telephone recording device and instructed him to record any threats or conversations had with the defendant. After recordings were made and reviewed by the police, the police attached a "body-wire" to the informant in advance of a meeting between the informant and the defendant to discuss their defense. At this meeting, which was scheduled by the defendant, the defendant made incriminating statements. Although the "body-wire" recordings in *Moulton* were made at a meeting arranged by the defendant, and apparently for the purposes of gathering information concerning anonymous threats and of protecting witnesses, the Court held that the Sixth and Fourteenth Amendments barred admission of the statements with respect to pending, charged crimes.

The Court viewed the fact that the state took advantage of the circumstances as particularly significant. The Court explained:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation omitted.] *However, knowing exploitation by the*

2. In the instant case the state suggests a distinction must be made where, as here, the defendant was not in custody when the incriminating statements were made. The Supreme Court addressed a similar argument in *Henry*. Referring to Henry's incarceration as a relevant factor, the Court said in footnote 11, 447 U.S. at 273, 100 S.Ct. at 2188:

> This is not to read a "custody" requirement, which is a prerequisite to the attachment of Miranda rights, into this branch of the Sixth Amendment. *Massiah* was in no sense in custody at the time of his conversation with his codefendant. Rather, we believe the fact of custody bears on whether the Government "deliberately elicited" the incriminating statements from Henry.

*State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.* Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* at 176, 106 S.Ct. at 487 (emphasis added).

The Court also rejected the argument that suppression of the evidence was not required because the state had other legitimate reasons for recording the conversation. The Court acknowledged, as it had in *Massiah*, that passive listening for the purpose of investigating uncharged crimes is permissible. But the Court held that the Sixth Amendment limits the use of the information obtained. The Court reasoned:

The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 179–80, 106 S.Ct. at 489–90 (footnote omitted).

One year later the Supreme Court returned to the issue of passive listening and reached a different result. In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a cellmate reported statements made by the defendant. The trial court found that the defendant's statements were unsolicited and spontaneous. The Supreme Court concluded that this finding was supported by the record. Hence, the Court was confronted with the living "listening post" alluded to by the majority in *United States v. Henry*, 447 U.S. at 271, note 9, 100 S.Ct. at 2187, note 9. As foreshadowed by Justice Rehnquist in his dissenting opinion in *Henry see, United States v. Henry, supra* at 300, note 9, 100 S.Ct. at 2202, note 9 (Rehnquist, J., dissenting), the Court held in *Kuhlman* that merely reporting a defendant's statements does not violate the Sixth Amendment. "Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson, supra* 477 U.S. at 459, 106 S.Ct. at 2630.

The Court reiterated that "the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." 477 U.S. at 459, 106 S.Ct. at 2630. As these cases illustrate, the "deliberately elicited" standard of *Massiah*

has been broadly applied to bar incriminating statements made outside the presence of counsel unless such statements are spontaneous and unsolicited. At least one commentator has suggested that the *Massiah* formulation has been replaced by a "likely to induce" standard. *See* Note, *Criminal Procedure—Eliciting New Meaning from "Deliberately Eliciting"—Maine v. Moulton*, 21 Wake Forest L. Review 1093 (1986), *see also United States v. Henry, supra* 447 U.S. at 277, 100 S.Ct. at 2190 (Blackmun, J., dissenting).

### B

In the instant case, the district judge ruled that the recorded statements were admissible because Currington was not in custody when the statements were made, Cochran was not a paid informant directed to interrogate Currington, and the conversations were initiated by Currington. The district judge stated that, "the state just took advantage of that situation." We note also that the trial court's ruling in this case was made prior to pronouncement of the Supreme Court's decisions in *Moulton* and *Kuhlmann*.

▋ Clearly, none of these factors alone would be determinative of the question whether the recording in this case was admissible. The defendants in *Massiah* and *Moulton* were not in custody. *See* note 2, *infra.* And, as illustrated by *Henry* and *Moulton*, the Sixth Amendment may apply, although the defendant initiated the conversation, if the state exploited a relationship or a set of circumstances where incriminating statements were likely to be made. Apparently the *Moulton* informant was also cooperating with the state for reasons other than monetary compensation. Therefore, we do not find the lack of compensation to the informant determinative.

▋ Instead, it is the problem of surreptitious interrogation created by the agency which permeates these cases. Therefore, we now confront the central question in this case, which is, whether the state "deliberately elicited" Currington's state-

ments. In this regard, we find the *Moulton* decision particularly helpful.

Although the instant facts are remarkably similar to *Moulton*, the state argues that *Moulton* is distinguishable on two grounds. First, in *Moulton*, the police knew as a result of information provided by the informant that the recorded meeting was for the purpose of discussing the charges and the conversants' defense. Second, the *Moulton* informant induced incriminating statements by repeatedly feigning lapses of memory and asking Moulton to review the crimes. While we must admit that these distinctions do exist, we do not find them determinative.

Like Moulton, Currington was free on bail. As in *Moulton*, the informant apparently was provided with a recording device and instructions as a means of investigating threats. However, the state was aware of the relationship between Currington and the informant. Since the informant, Cochran, was one of Currington's principal alibi witnesses, discussions relating to Currington's defense were to be expected. Clearly the state was not without the knowledge that incriminating statements might result.

Nor can it be said that Cochran acted merely as a "listening post." Even assuming that Currington initiated the conversation in question, Cochran was an active, not passive, participant. The recorded portion of the conversation lasts slightly over ten minutes. During this period, Cochran asked approximately twenty questions, some of which were likely to elicit incriminating statements. For example, in response to a statement by Currington that he recently had received a check, Cochran asked about the amount and what the payment was for. When Currington expressed some concern over a scheduled appearance in court, Cochran quizzed him about why he was worried and about what Currington thought was "going to come up in court." Cochran also inquired about Currington paying some money which Cochran claimed was "due" him; later in the conversation Currington told Cochran that Cochran had "five grand coming." Cochran pressed Currington for the substance of some con-

versations held by Currington with third parties. Finally, Cochran questioned Currington about what should happen if Cochran was subpoenaed by the prosecutor. Thus, in our view, Cochran's role in this conversation amounted to "the functional equivalent of interrogation" described in Part II of Justice Powell's concurrence in *Henry*. *See United States v. Henry*, 447 U.S. at 277, 100 S.Ct. at 2190. *Compare Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (noting distinction between Fifth and Sixth Amendment "interrogation"). *See, e.g., Maine v. Moulton*, 474 U.S. at 177, 106 S.Ct. at 488, note 13.

■ In the alternative, the state contends that Cochran was not an agent of the state and, therefore, his acts are not attributable to the state. There is little to support this argument. Although Cochran allegedly approached the police for protection and was not paid for his services, he was acting pursuant to instructions from an employee of the prosecuting attorney's office when he made the recording. Further, he utilized equipment provided by that office and, according to his own testimony, he promptly returned the tape after making the recordings.[3] Under these circumstances, we do not find the lack of monetary compensation particularly significant. We hold that when making the recording, Cochran was acting as an agent whose acts are attributable to the state.

As the trial court stated, the state "took advantage" of the circumstances. It is that knowing exploitation which *Massiah* and the Sixth Amendment expressly forbid.

### C

■ Having reached the conclusion that Currington's constitutional right to counsel was violated when he was "interrogated" by an individual not known to him to be an agent of the state, we next must determine whether the law requires exclusion of that evidence. This issue has been a matter of continuing disagreement among the members of the United States Supreme Court. *See, e.g., United States v. Henry, supra*, 447 U.S. at 289, 100 S.Ct. at 2196 (Rehnquist, J., dissenting). *See generally* Comment, *Sixth Amendment Exclusionary Rule: Stepchild of the Right to Counsel*, 24 Hous.L.Rev. 765 (1987). However, the majority rule as set forth in *Moulton* continues to be that even where the state acts in good faith, the evidence must be excluded if obtained in violation of the defendant's Sixth Amendment rights. Therefore, we hold the trial court erred by admitting in evidence the incriminating statements procured by the state's informant, Cochran.

### D

■ The state does not contend, nor could it reasonably be argued, that this evidence was harmless. *See* I.C.R. 52. Prior to Cochran's testimony and introduction of the recording at a continued preliminary hearing, the hearing judge was prepared to dismiss the charges. As the prosecuting attorney stated during closing arguments to the jury, "Perhaps the most devastating evidence against Mr. Currington that was admitted during the course of the trial is that phone call between Mr. Currington and Mr. Cochran." We conclude that the error was not harmless. It may not be disregarded. Currington is entitled to a new trial.

### II

■ Having reached the conclusion that the judgment of conviction must be set aside, it is necessary for us to pass upon those other issues which may arise at a new trial. *See* I.C. § 1–205. The only such issue presented is Currington's claim that he was denied due process when the state lost certain evidence gathered in the fire investigation.

One of the fire investigators removed three samples of carpet from the floor of Currington's residence after the fire. La-

---

3. Our examination of the original tape recording indicates that actually two conversations were recorded. Although we are concerned only with that recorded conversation which was introduced at trial, we note that there appears to be no distinguishing factors which would favor admittance of the second recorded conversation, at a new trial.

ter, these samples were tested at the state forensic laboratory for the presence of "accelerants"—substances which increase the burning rate of other materials. The tests failed to show the presence of accelerants.[4] The samples were lost following the laboratory tests.

Currington contends that these samples were potentially exculpatory evidence which he did not have an independent opportunity to examine. We fail to see how these samples would be material to Currington's defense, depriving him of due process by their loss. The initial inquiry in cases where evidence has been withheld or not preserved by the state is whether the nature of the evidence is known sufficiently to allow a determination of the evidence's materiality. *See State v. Leatherwood*, 104 Idaho 100, 656 P.2d 760 (Ct.App. 1982). Here the nature of the evidence— carpet samples purportedly showing negative tests for accelerants—is sufficiently known. The next question then is whether that evidence was material. Evidence is material if it appears to raise, or would have raised, a reasonable doubt concerning the defendant's guilt when viewed in relation to all competent evidence admitted at trial. *Id.* at 105, 656 P.2d at 765. Where materiality can be ascertained, the duty to preserve evidence

> must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed [or not preserved], and also be of such a nature that a defendant would be unable to obtain comparable evidence by other reasonably available means. [Footnote and citation omitted.]

*California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984).

Here, Currington has not shown that destruction of the carpet samples deprived him of an opportunity to develop anything other than what the state had already established—a negative test for accelerants. Consequently, he has not satisfied either the test of exculpatory value or the test of materiality. We conclude, therefore, that the missing samples were not material to Currington's defense and their loss did not deprive him of due process.

For the reasons stated above, the district court's judgment convicting Currington of first-degree arson and of destruction of insured property is hereby vacated. Currington is entitled to a new trial. Case remanded.

BURNETT, J., concurs.

SWANSTROM, Judge, dissenting.

I respectfully dissent from the conclusions of my colleagues in part B. In my view the facts of this case are not "remarkably similar to" those in *Maine v. Moulton, supra.* Here the facts are significantly different and they should lead to a result different from that reached by a closely divided Court in *Moulton.*

Currington's telephone call to Cochran shortly before the preliminary hearing has an entirely different context from the recorded meeting in *Moulton* where defense strategy was to be discussed. Here, Currington's call shows that he did not know whether Cochran stood with him or against him. Currington's statements were guarded. He was suspicious obviously that someone who could hurt him at trial had talked to the prosecuting attorney. Currington seemed to be feeling out Cochran to determine whether he was the one. At least three times Currington indicated that he did not know who Cochran may have talked to or what Cochran may have said

---

4. The technician who performed the tests explained that the negative result of the tests may have been due to (1) collection of the samples from areas in the house where no accelerants had been used, (2) a level of accelerants in the samples below the level that could be detected by the instruments used in the tests, or (3) the complete consumption of the accelerants in the fire. Although the technician opined that his test conclusions did not prove the absence of accelerators otherwise in connection with the fire, he offered no testimony favorable to the state's theory of arson.

"about what happened." It is true that Cochran asked several questions. However, Currington's cryptic statements invited questions from Cochran.

Currington made a point of letting Cochran know that he had received a large sum of money as a "settlement between the boys." This was an apparent reference to "Jim and Tony." According to the trial testimony of Cochran, Currington had previously frequently discussed his two associates. Currington had talked about a Denver business "front" through which they "filtered" large sums of money. Currington had suggested that Cochran could be a well-paid "collector" for them. According to Cochrane, after the fire Currington talked to him about what Jim and Tony would do if someone crossed them; he mentioned, for example that they were capable of pouring acid on Cochran's girl friend, or of permanently separating her from her child. Cochran testified that because of these threats he went to the prosecuting attorney and agreed to record Currington's calls. This testimony, for whatever it was worth, stood unrebutted at trial; it helps explain the full implications of Currington's call to Cochran.

The tape recording of the call reveals that Currington told Cochran, "You know, if you haven't said anything, then I don't have anything to—ya know—you get what's due comin to ya." Currington made it clear that "if everything goes smooth like it's supposed to," Cochran would have at least "five grand" coming. In all of this, there was a much more subtle suggestion made to Cochran that he would have something quite different coming from "the boys" if he did not help things go smoothly at the preliminary hearing.

This is hardly the case of one trusting co-defendant confiding in another. Nor is this a case where state action induced the defendant to make any statements that he otherwise would not have made. Here, the only state action was to provide the means for recording Currington's telephone call to Cochran. In context, Cochran's questions and answers cannot be characterized as intended to elicit incriminating statements from Currington. I would hold that there has been no intrusion by the state upon Currington's Sixth Amendment rights. Accordingly, I would affirm the judgment of conviction.