MICHAEL JONATHAN HAYES AND DAWN KIMBERLY RICHMOND, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 20036

August 21, 1990                    797 P.2d 962

[Rehearing denied September 14, 1990]

*Laura Wightman FitzSimmons,* Carson City, for Appellant Hayes.

*Martillaro & Martillaro,* Carson City, for Appellant Richmond.

*Brian McKay,* Attorney General, Carson City; *Noel S. Waters,* District Attorney and *Keith Loomis,* Deputy District Attorney, Carson City, for Respondent.

## OPINION

By the Court, ROSE, J.:

After police arrested appellant Michael Jonathan Hayes (Hayes) outside of his residence for possession of stolen property, Hayes called to someone inside the residence. Police officers then entered the residence to conduct a protective sweep search for other persons who could pose a danger to the officers. During the

course of the sweep, officers observed various narcotics and paraphernalia in plain view. Based on the plain view observations, the officers obtained a search warrant and seized the evidence underlying the narcotics convictions in this case. Hayes and Dawn Kimberly Richmond (Richmond) appeal their respective judgments of conviction, arguing that no emergency existed to justify the warrantless entry and plain view observations by police. We hold that, based on the circumstances in this case, the protective sweep search leading to the seizure of the evidence underlying these convictions violated appellants' constitutional rights to be free from unreasonable searches and seizures. Since the evidence seized based on the sweep search was necessary to appellants' convictions, the convictions must be reversed.

## FACTS

Detective William Kugler of the Carson City Sheriff's Department (CCSD) was investigating appellant Hayes for possession of stolen property, namely, an automobile. In January 1988, Detective Kugler, pursuant to a warrant, seized from Hayes an automobile which officials believed had been stolen. Hayes resisted the seizure by attempting to drive away from officers approaching Hayes' residence. Hayes himself was not arrested for possession of stolen property because police first needed, or wished, to obtain testimony against Hayes from Hayes' suspected accomplices. Soon thereafter, fearing he would be charged with felony possession of stolen property, Hayes contacted attorney James Wessel. Wessel testified that Hayes instructed him to inform the District Attorney and the CCSD that he wished to turn himself in. Hayes explained to Wessel that he feared losing his union standing if he was arrested at work. Wessel testified that he in fact informed both the District Attorney's office and Detective Kugler that "Hayes was willing to turn himself in."

In February 1988, Detective Rod Cullen testified, he and Kugler interviewed one Don Cisco, who was a burglary suspect. Cullen suspected that Cisco was connected to Hayes. Kugler testified that Cisco admitted to being an ex-felon from Colorado with "a violent past," and that Cisco had an "extensive" rap sheet. According to Cullen, Cisco said that he and Hayes had had a falling out, culminating in Hayes' ordering Cisco to get off of Hayes' property at the point of a shotgun.

May 6, 1988, was the day on which Hayes was arrested. Early that day, Kugler conducted drive-by observations of Hayes' residence. He observed "a number" of cars near the residence which he believed indicated the "possibility" there were "multiple subjects" in the residence. Kugler then had a meeting with

several deputies to discuss how to serve an arrest warrant on Hayes. According to Kugler, officers did not discuss whether Hayes might have weapons and Kugler did not have any personal knowledge of any weapons at Hayes' residence, except for Cisco's story about the shotgun. At the meeting, one Officer Martino mentioned that, a few days before, Don Cisco had been released on bond from jail on a felony charge. Kugler stated that no one discussed the possibility that Cisco might be at Hayes' residence, however. Kugler also stated that he knew that Hayes' wife's name was Dawn Richmond.

Later that day, Kugler and five other armed members of the CCSD went to Hayes' mobile home at 1830 Brown Street in Carson City to arrest Hayes pursuant to an arrest warrant for possession of stolen property, a felony. It was afternoon and thus presumably light. Upon arriving, Kugler again observed "numerous vehicles" near the residence. The six officers approached the mobile home with guns drawn. Detective Kugler and Officers Johnson and Martino approached the front door of the mobile home. As they were walking toward the door, another officer radioed them that he had found a shotgun in the front yard. An officer knocked on the door and Hayes answered the door. Hayes initially attempted to shut the door and step back in, but when ordered to come out, Hayes complied and stepped out of the residence where officers handcuffed him. Hayes did not attempt to flee or offer any resistance and was, by all accounts, safely in the officers' custody.

After being cuffed, Hayes called out the name "Dawn" two or three times. The door of the trailer was open, but Hayes' wife was not visible. Both Kugler and Martino stated that they feared that Hayes might be calling to Don Cisco, who could pose a danger to the officers. Martino and another officer immediately moved to each side of the door and then entered the trailer where they conducted a "sweep search" for guns or persons who could pose a danger to the officers. Martino found Dawn Richmond in the back bedroom.

During the course of the sweep search, Martino observed in plain view small amounts of marijuana, a scale, a pile of powder next to a hypodermic needle, and a handgun in a holster, which Martino immediately unloaded. On the basis of these observations, officers secured the residence, obtained a search warrant, and conducted a more thorough search for narcotics. The narcotics seized included the marijuana and a bag containing about 85 grams of methamphetamine. The officers also seized several notebooks containing records of apparent drug sales and lists of police radio frequencies, as well as many other items indicative of drug dealing, such as police band radio scanners.

On the basis of the seized evidence, appellants were charged with the narcotics-related counts at issue in this appeal. The defense filed a motion to suppress the evidence on the ground that no exigency existed to justify the sweep search. The court concluded that the officers had reasonable grounds to believe that a potentially dangerous third party might be present on the premises and accordingly denied the motion.

Following the waiver of a jury trial by both defendants, the court conducted a bench trial and found the appellants guilty on all four charged counts. During trial, appellants were jointly represented by attorney Carl F. Martillaro. On appeal, appellant Richmond is still represented by Martillaro, but Hayes is represented by Laura Wightman FitzSimmons.

## LEGAL DISCUSSION

### I.  *The legality of the police officers' protective sweep search.*

### A.  *Introduction.*

As stated in Payton v. New York, 445 U.S. 573, 602-3 (1980), police may enter a residence to execute an arrest warrant. Here, however, the arrest had already occurred before police entered the residence. Thus, the police officers needed a justification independent of the arrest warrant in order to enter the residence legally. As potential justifications for the entry, the parties refer both to the "protective sweep" doctrine and the "emergency," or exigent circumstances, doctrine. These doctrines are overlapping, but distinct. *See generally* 2 W. LaFave, *Search and Seizure* §§ 6.1(f); 6.4(c) (2d ed. 1987). Generally, the emergency doctrine authorizes warrantless searches for particular items or particular suspects based on the existence of various exigent circumstances. *See id.* at § 6.1(f). Protective sweep searches, on the other hand, should be less particularized and probing, because their sole purpose is to protect police officers during the course of an arrest from potentially dangerous persons other than the arrestee who are believed to be on the premises. Unlike the somewhat broader emergency search doctrine, the sole exigent circumstance which is relevant to a protective sweep search is the existence of reasonable grounds to fear for the officers' safety. This case concerns the protective sweep doctrine.

In the present case, police officers obtained the search warrant for the narcotics and paraphernalia based on plain view observations made during the protective sweep search of Hayes' mobile home following Hayes' arrest for possession of a stolen vehicle.

The issue here is whether the plain view observations supporting the search warrant were legally obtained. For plain view observations to be admissible, the plain view doctrine requires, among other things, that the officer be lawfully present at the point of observation. Johnson v. State, 97 Nev. 621, 624, 637 P.2d 1209, 1211 (1981). Whether the observing officer was lawfully present in Hayes' mobile home depends on whether the protective sweep search was justified.

Appellants do not seriously contend that the officers exceeded the proper scope of a protective sweep search, or that the incriminating items were not in plain view. Instead, appellants argue that no protective sweep search was justified because police officers had no reasonable grounds to fear for their safety. The constitution draws a line which limits police authority to conduct sweep searches. We conclude that this line has been crossed in the present case. Under the standards recently announced by the United States Supreme Court, the arresting officers here lacked sufficient grounds to fear for their safety to justify this protective sweep search. Therefore, the evidence seized pursuant to the warrant must be suppressed because it was a fruit of the previous unlawful protective sweep search. *See generally* Wong Sun v. U.S., 371 U.S. 471 (1963). Since the evidence seized pursuant to the warrant was necessary to each of appellants' convictions, the convictions must be reversed.

B. *Legality of the protective sweep search.*

The recent United States Supreme Court decision of Maryland v. Buie, 110 S.Ct. 1093 (1990) explains when a protective sweep search is justified incident to an arrest of a defendant:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be *articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. . . .*

*Id.* at 1098 (emphasis added). We believe that the standard stated by the majority in *Buie* is a reasonable one. We are bound to follow the constitutional interpretations of the United States

Supreme Court, and we further adopt it as the standard to be applied in the State of Nevada. Therefore, our analysis in this case must be to determine whether there were sufficient and articulable facts presented which would warrant a reasonably prudent officer to believe that Hayes' trailer harbored an individual that posed a danger to those on the arrest scene outside. Based on our review of the circumstances as found to exist by the district court, we conclude that the arresting officers did not have specific and articulable grounds to support a reasonable belief that the trailer harbored an individual posing a danger to the officers.[1]

First, the State points to facts indicating Hayes' personal propensities for violence, such as Hayes' previous attempt to resist seizure of his automobile and Cisco's statement that Hayes had threatened him with a shotgun. Hayes' personal propensities are largely irrelevant, however, for the simple reason that Hayes himself was already in safe custody at the time officers began the sweep. The issue here is whether officers could harbor a reasonable belief that some person *other than* Hayes was present and posed a substantial danger.

The State's principal argument is that, when Hayes called out the name "Dawn," officers formed a reasonable belief that Hayes was calling out to one Don Cisco, who had just been released on bail and had previously admitted to having a record as a violent felon. Although we are sympathetic to the officers' predicament, we cannot conclude on the facts of this case that merely calling out the name "Dawn" created a reasonable basis to believe that a dangerous person was inside the trailer. First, Kugler, the lead officer in the arrest, admitted that he knew that Hayes' wife's name was Dawn; he candidly admitted that he "fully expected to personally find" Dawn at the residence that evening. Second, Kugler said he was aware that Hayes and Cisco had had a violent falling out, culminating in Hayes' ordering Cisco off Hayes' property at the point of a shotgun; specifically, Kugler said Cisco had told him that Hayes believed Cisco was a "snitch." Given these circumstances, we cannot conclude that Kugler could harbor a reasonable belief that Cisco was present that afternoon merely because Hayes called out the name "Dawn." To the

---

[1]Review of the district court's determination that exigent circumstances existed presents a mixed question of law and fact. United States v. Alfonso, 759 F.2d 728, 741 (9th Cir. 1985); United States v. McConney, 728 F.2d 1195, 1200-04 (9th Cir. 1984) (en banc), *cert. denied,* 105 S.Ct. 101 (1984). The findings of fact of the district court are reviewed under the deferential standard set forth in NRCP 52(a), but the conclusion as to whether exigent circumstances existed is subject to independent review by the appellate court. *See id.*

contrary, we agree with the U.S. Ninth Circuit Court of Appeals which stated that, upon being arrested outside a residence, "[i]t is not unreasonable for an individual to call into his house to his friends or relatives that he is being taken away." United States v. Basurto, 497 F.2d 781, 790 (9th Cir. 1974) (holding that a protective sweep search of a mobile home following Basurto's arrest outside the mobile home was not justified, even though Basurto was a suspected drug dealer and even though Basurto had called out "It's the police" upon being arrested). In the case relied upon by the district court, in contrast, the officers heard an unidentified person yell "Look out—they have a shotgun," words which are much more indicative of danger and intent to resist arrest. See United States v. Bowdach, 561 F.2d 1160 (5th Cir. 1977). We cannot conclude that Detective Kugler's belief that Hayes was calling to anyone other than his wife was reasonable under the circumstances of this case.

That it was unlikely that Cisco would be present is reflected in the officers' testimony. Kugler testified that he "had no idea where he [Cisco] might be" on the date of Hayes' arrest, and Kugler stated that, at the pre-arrest meeting with the other officers, he "never inferred [to the other officers] that he [Cisco] was there or not there." Accordingly, Kugler could only testify that "there was a *possibility* he might be there." Kugler further stated that he had *"no fact"* on which to base this belief, only an "inclination." Similarly, Officer Martino testified that "we thought there was a *possibility* he would be there."

If any possibility of danger were sufficient to create a reasonable belief of a danger, the police would have *carte blanche* power to conduct sweep searches of citizens' homes incident to virtually any arrest for a felony, whether violent or not, even where the arrestee surrenders at the front door; by means of post-hoc rationalizations, the police could justify virtually any sweep search. This would be contrary to the traditionally strong protection accorded to citizens' homes under both the United States and Nevada constitutions. We further believe that this is why, in *Buie,* the Supreme Court affirmed the requirement that officers' perception of danger be based on some *specific and articulable* grounds. In short, while officers need not have probable cause to believe a dangerous third person is present, the mere possibility of such a presence is not enough. Instead, police must have specific and articulable grounds sufficient to support a reasonable belief that a person posing a danger is present. On the facts of this case, Hayes' calling out a name known by the lead officer to be the name of Hayes' wife simply does not support such a reasonable belief.

We are further troubled by the fact that there is some indication that such protective sweep searches of homes incident to arrests are standard procedure, or at least a common practice, of CCSD. On the one hand, Officer Martino testified that there is no written sweep policy. However, when asked why it would not have been safer simply to withdraw from the residence, Detective Kugler responded by explaining that sweep searches of residences incident to execution of arrest warrants were ''a standard operating procedure.''

Such a policy or operating procedure would present two problems. First, absent greater indication of danger than was present in this case, it appears that it would have been far safer for the six armed police officers simply to withdraw after Hayes was in safe custody, instead of proceeding through each room of the residence and risk confrontation with others who might be present. If officers have no reasonable basis to fear danger from third persons, the constitution requires the officers to withdraw. As stated in *Bowdach*, ''the search is only justified when it is necessary [*i.e.* reasonably believed to be necessary] to allow the police officers to carry out the arrest without fear of violence.'' *Bowdach*, 561 F.2d at 1169. Where there truly are no specific indicia of danger going beyond hunches or generalized anxiety, we believe that police officers generally will be at less risk in withdrawing than in proceeding through each room of the arrestee's residence to confront anyone present. Secondly, a blanket sweep search procedure would be patently unconstitutional. It is clear that ''police officers may not as a matter of routine departmental practice search a residence whenever a person is arrested inside the premises.'' United States v. Gardner, 627 F.2d 906, 910 (9th Cir. 1980). The district court found that this was not a pretextual search and that the officers in the present case did not act in any bad faith, and we do not question the good faith of the officers involved in the present case. Nevertheless, we point out that engaging in sweep searches as a pretext for substantive searches would be unsound practice. Such a practice jeopardizes otherwise meritorious convictions.

The principal case relied upon by the district court in concluding that officers could harbor a reasonable belief is *Bowdach, supra*. In addition to the factual differences already mentioned, *Bowdach* is significantly different from the facts of the present case. First, although Hayes' personal propensities are largely irrelevant to this sweep, whether other persons present were dangerous may depend on the character of crime for which the arrestee is being arrested. Here, it is very significant that Hayes' underlying crime, possession of a stolen automobile, was a nonviolent one. In *Bowdach*, in contrast, the arrestee was suspected

of the commonly more violent crime of narcotics trafficking; moreover, in *Bowdach* an informant had told police that the arrestee was a professional hit man. The fact that Hayes' underlying crime was not violent also distinguishes the present case from other cases in which we have found exigent circumstances to exist. The present case is further distinguishable from other decisions finding exigent circumstances to justify a protective sweep, because the officers here were not in hot pursuit of the arrestee. Indeed, here there is evidence that, because he expected to be arrested, Hayes had offered to turn himself in voluntarily on request.

The State further argues that Hayes was known to associate with felons, which increased the risk that any third person present was dangerous. Assuming Hayes had such associations, this does not demonstrate justification for this search for two reasons. First, officers did not point to any specific and articulable facts to indicate that other such felons would actually be present at the time of arrest. In the case relied upon by the district court, officers had specifically observed other suspects entering, but never leaving the residence shortly before the sweep search. *See Bowdach, supra.* Here, in contrast, police never observed other known felons frequenting Hayes' residence during the time before the arrest. The fact that there were several cars "on or about" the area of Hayes' mobile home is not conclusive. Detective Kugler ran a license check on the vehicles, but did not identify any of the vehicles as belonging to any of Hayes' suspected associates, whom police said were well-known to them. As a result, Detective Kugler could only state that he believed "there was a *possibility* there *might* have been multiple subjects there." It is also very unclear in the record whether the vehicles were parked immediately adjacent to the residence or merely in the same general area, equally near other homes. It was the State's burden to establish that the vehicles supported a reasonable belief that dangerous third parties were present. *See Basurto,* 497 F.2d at 790. The State has not met this burden.

Second, evidence that any others present would be dangerous or desperate is far weaker here than in *Bowdach.* Detective Kugler's testimony indicates that the persons believed to be Hayes' closest compatriots in the suspected stolen property scheme had *already been arrested, charged and had pled guilty to burglary.* According to Kugler, Hayes' arrest was delayed to give police time to obtain testimony from the others against Hayes. This situation differs significantly from *Bowdach,* where the other persons seen entering the residence had been indicted but *had not yet been arrested;* since they had not yet been

apprehended, the other persons in *Bowdach* presented serious flight risks and, hence, posed a much greater risk of danger to officers. In summary, the State has not pointed to sufficient specific and articulable reasons to support a reasonable belief that other felons would be present and would pose substantial danger to the officers. A generalized reputation of association with other felons, standing alone, is not sufficient to authorize a protective sweep.

The State's strongest contention is that the officers had reasonable grounds to believe that there were weapons present and that, for this reason, the person to whom Hayes called out posed a risk of danger to the officers. However, the district court's finding that "the defendant was known to have a *number* of weapons on the premises" prior to the arrest was erroneous. One officer did testify that Cisco reported that Hayes had pulled a shotgun on him and, of course, the officers found a shotgun in the front yard. Additionally, Officer Martino testified that Hayes was "known to have several weapons in the house." However, we find *no* specific and articulable facts in the record to support Officer Martino's statement that police knew Hayes had more than one gun. Officer Kugler specifically denied that Hayes was under investigation for trafficking in narcotics or any crime other than possession of stolen property. We agree with Hayes' contention that conclusory statements of a police officer cannot satisfy the constitution's requirement of specific and articulable facts to support a sweep search. If it were otherwise, police could enter and search any home incident to any arrest on the basis of the mere assertion that officers believed weapons or dangerous persons could be present.

Based on the foregoing, the arresting officers had specific and articulable reasons to believe only that Hayes owned a shotgun. We cannot conclude that the presence of a single unconcealed shotgun in the front yard suffices to justify this search. The evidence of the presence of weapons was far greater in the case relied upon by the district court, because, in *Bowdach,* sources had informed police that the suspect was a hit man who possessed *several* weapons. It is not uncommon for citizens in this state to own shotguns and other hunting weapons, and officers had already found and secured a shotgun when the sweep search began. Most importantly, the following circumstances indicating that the officers were *not* in imminent and substantial danger simply outweigh the presence of the single shotgun: Hayes' alleged crime was nonviolent and there was evidence he had offered to turn himself in; Hayes himself was safely in custody *outside* the residence; officers had reason to believe Hayes was merely calling for his wife; officers had no reasonable grounds to

believe Don Cisco would be present at the residence; Hayes' alleged property crime accomplices were not fugitives; and, since it was afternoon, it was presumably light and the six armed officers could have easily withdrawn with Hayes in custody with less danger than entering the residence and searching each room.

The cases cited in the dissent strengthen our conviction that the present sweep search was unconstitutional. With the exception of *Basurto, supra,* which invalidated a sweep search, the eight cases cited in the dissent are dramatically different from the present case.[2] In each of the remaining seven cases, at least two of the following distinguishing factors were present: (1) the offense for which the defendant was arrested was very serious, involving actual violence (armed robbers) or a real risk thereof (major drug traffickers), all of which increases the risk that third persons present might be dangerous; (2) there was reason to believe that additional co-conspirators would be present at the scene of arrest; (3) police were in hot pursuit of the arrestee, increasing the risk that third parties present would assist in attempts to resist arrest; (4) there was specific reason to believe that there were weapons inside the residence; and/or (5) one or more officers were already inside the residence at the time of arrest, increasing the need for a sweep search to ensure a safe withdrawal. Representative of the dissent's cases in *Buie* itself, which involved the arrest of an armed robbery suspect, where police knew that the suspect had an accomplice who was not accounted for. Certainly, none of the seven cases cited in the dissent involved a search after an arrest outside the home for a nonviolent property crime where the lead arresting officer believed the arrestee was merely calling to his wife and not to a co-conspirator.

In terms of indicia of danger to arresting officers, the cases cited in the dissenting opinion are undoubtedly a qualitative "cut above" the present case. The position adopted by the dissent would, in effect, allow police to enter and search any residence incident to a felony arrest for any crime whenever the arrestee's family is at home. Indeed, prior to *Buie,* some courts held that sweep searches of a person's home incident to arrest were permissible wherever a third person was present, regardless of whether the third person could be dangerous. *See LaFave, supra,* § 6.4(c), n.52. This view was squarely rejected by the United States Supreme Court in *Buie* by the requirement that officers

---

[2]The cases other than *Basurto* are: *Buie, supra; Johnson, supra; Gardner, supra;* United States v. Merritt, 882 F.2d 916 (5th Cir. 1989); United States v. Castillo, 866 F.2d 1071 (9th Cir. 1988); United States v. Standridge, 810 F.2d 1034 (11th Cir. 1987); United States v. Escobar, 805 F.2d 68 (2d Cir. 1986).

have a reasonable belief that any third person who might be present could be *dangerous*.

Finally, the dissent makes several references to the fact that illegal drugs and a loaded gun were actually found during the sweep, implying that this in some manner justifies the entry. It has long been established that an illegal search cannot be validated by the fruits of the search. As Justice Sutherland stated decades ago, "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light." Byars v. United States, 273 U.S. 28, 29 (1927).

## II. *Appellants' remaining contentions.*

Although we need not do so, we briefly discuss the two remaining contentions raised by appellants' against their convictions.

First, Hayes argues that he was denied his sixth amendment right to effective assistance of counsel due to conflicts of interest inherent in trial counsel Carl Martillaro's joint representation of appellants at trial. While ineffective assistance claims are ordinarily heard during post-conviction proceedings following direct appeal, we have considered such claims relating to conflicts of interest on direct appeal. *See, e.g.,* Mannon v. State, 98 Nev. 224, 645 P.2d 433 (1982). Hayes is correct that there were both potential and actual conflicts of interest in counsel Carl Martillaro's joint representation of appellants at trial. Most importantly, it would have been in Hayes' interest to argue that he was merely guilty of possession and that it was only Richmond who was trafficking. This argument could have been persuasive to the jury. The evidence of trafficking was somewhat stronger against Richmond in part because most of the records of transactions in the notebooks appear to have been in Richmond's handwriting, not Hayes'. Certainly if Martillaro had not been representing Richmond, Martillaro could have sought to cast Richmond, not Hayes, as the trafficker.

The problem here is that appellants each specifically waived their right to representation by conflict-free counsel and specifically requested Martillaro to represent them jointly. Although we strongly discourage such joint representation of criminal defendants, we will not bar such joint representation as a matter of law in all cases. Accordingly, criminal co-defendants may waive their right to conflict-free representation by insisting on joint representation by a single attorney, despite the obvious potential conflicts.

Harvey v. State, 96 Nev. 850, 853, 619 P.2d 1214, 1216 (1980). In procuring such a waiver, however, the district court "should fully explain . . . the nature of the conflict, the disabilities which it may place on [counsel] in [his or her] conduct of [the] defense and the nature of any potential claims which appellants will be waiving." Kabase v. District Court, 96 Nev. 471, 473, 611 P.2d 194, 195-96 (1980) (citations omitted). Additionally, "the trial court should address each defendant personally, explain the dangers of joint representation, and inquire as to facts which might reveal conflicts. If actual or potential conflicts exist, each defendant must voluntarily, knowingly and understandingly decide on the joint representation." Harvey, 96 Nev. at 854, 619 P.2d at 1217 (citations omitted).

Here, the district court fully complied with Kabase and Harvey in procuring the waiver of conflict-free representation from both appellants. At the arraignment, immediately after Martillaro stated he was representing appellants jointly, the court sua sponte raised the conflicts problem. The court did the following: questioned each appellant individually; specifically and strongly advised both appellants against joint representation and offered to appoint substitute counsel at state expense; explained the general risks of joint representation; and offered each appellant the time to think it over, an offer which appellants declined. Most importantly, the court specifically warned Hayes that joint representation would preclude him from claiming that the larger quantities of narcotics were Richmond's, not his. After questioning by the court, each appellant stated a desire for joint representation by Martillaro.

During the course of trial, actual conflicts may arise which are of a much greater type, magnitude, or frequency than the potential conflicts of interest foreseen at the time of the waiver of conflict-free counsel. If this occurs, this court may be justified in setting aside the waivers. See Carter v. State, 102 Nev. 164, 717 P.2d 1111 (1986) (holding that district court may order a mistrial due to severe actual conflicts of interest manifested at trial, despite previous waivers of the right to conflict-free representation). In the present case, however, based on the record before us, the important actual conflicts which arose during trial related only to Hayes' potential defense that Richmond was the one trafficking; although serious, these actual conflicts were not greater than anticipated. Thus, we conclude that the waiver is binding on the facts of this case.

The other contention raised by Hayes applies both to Hayes and Richmond. Hayes argues that the convictions for both trafficking

and possession for the purpose of sale violated the constitutional prohibition against double jeopardy. Alternatively, Hayes contends that the convictions violated the applicable criminal statutes in NRS Chapter 453 governing these counts. We need not reach the constitutional issue, because the State correctly concedes that our recent decision in Vidal v. State, 105 Nev. 98, 769 P.2d 1292 (1989) mandates reversal on statutory grounds. NRS 453.337 authorizes various sentences for possession for purposes of sale, "*[u]nless* a *greater* penalty is provided in NRS . . . 453.3395." NRS 453.337(2) (emphasis added). In *Vidal,* we held that this language precludes any conviction for possession for purposes of sale where the defendant is subject to a *greater* punishment under NRS 453.3395 based on a charge of trafficking of the same controlled substance. Since Hayes and Richmond were in jeopardy of greater sentences under NRS 453.3395(1) than under NRS 453.337(2), *Vidal* mandates reversal of appellants' convictions for possession of narcotics for purposes of sale.

## CONCLUSION

Appellants' four convictions must be reversed because the protective sweep search of Hayes' residence was not constitutional. The police officers did not articulate sufficient facts to establish that a reasonable police officer would believe a person posing a danger was harbored inside the trailer. When arrested outside the trailer, Hayes called for "Dawn." Police expected to find Hayes' wife Dawn at the trailer and did not believe the ex-felon Don Cisco would be there. At best, the police believed that Don Cisco might be present and this is insufficient to support a reasonable belief of danger. While a shotgun was found in the yard outside the trailer, there were no specific facts articulated to support the police officer's generalized belief that there might be weapons inside the trailer. Therefore, the entry of Hayes' trailer after his arrest cannot be justified on the protective sweep theory and the search of the trailer was therefore unconstitutional.

Appellants' convictions of possession for purposes of sale also must be reversed for the independent statutory reasons set forth in *Vidal.* Accordingly, for the reasons set forth in this opinion, appellants' convictions are hereby reversed and the case remanded for further proceedings.

YOUNG, C. J., and SPRINGER, J., concur.

STEFFEN, J., with whom MOWBRAY, J., agrees, dissenting:

Setting aside my concerns about the social value of the exclusionary rule and its efficacy in protecting Fourth Amendment

interests, I suggest that there are sound reasons for affirming the judgments entered by the district court.

In balancing the right of the appellants to enjoy freedom from unreasonable searches and seizures, even in their criminal enterprise, and the right of the deputies to take reasonable measures to protect themselves from unknown persons who could pose a threat to their safety, the lower court determined that the arresting officers were entitled to the benefit of the doubt. I agree. As the expanding criminal community becomes progressively more active, resourceful, and violent, other courts are providing the law enforcement community with a correspondingly greater latitude in protecting itself. It seems to me that the preservation of a quality society justifies such a dispensation, and I firmly believe that we should follow suit.

The United States Supreme Court has recently declared that "[a] 'protective sweep' is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers and others." Maryland v. Buie, 110 S.Ct. 1093, 1094 (1990). Under the ruling in *Buie,* and officer is only required to have *a reasonable belief* that the area swept harbors an individual *posing a danger* to the officer and others. *Id.* at 1095. Moreover, no one factor is determinative of what is "reasonable." In *Buie,* the Supreme Court employed a balancing test, "balancing the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 1096.

The trend in the United States Circuit Courts appeared to be consistent with the more relaxed standard eventually enunciated by the *Buie* court. In United States v. Escobar, 805 F.2d 68 (2nd Cir. 1986), the court held that:

> Law enforcement officers may conduct a security check—a quick and limited pass through the premises to check for third persons—without a warrant when making an arrest on private premises when they reasonably fear that other persons are lurking within who *may* pose a threat to their safety or are *likely* to destroy evidence. . . . [Emphasis added.]

*Id.* at 71. The 5th Circuit, upholding a sweep search after the defendant had been arrested outside a motel room believed to belong to a friend of the defendant, held that:

> Arresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest—even if the arrest is made near the door but outside the lodging—where they have reasonable grounds to believe that there are other persons present inside who *might* present a security risk. [Emphasis supplied.]

United States v. Merritt, 882 F.2d 916 (5th Cir. 1989). Finally, in United States v. Standridge, 810 F.2d 1034 (11th Cir. 1987), the court validated a sweep occurring after officers had arrested an armed bank robber, reasoning:

> Every arrest must be presumed to present a risk of danger to the arresting officer. [Citation omitted.] Where necessary, police arresting a suspect may conduct a protective sweep of the area to check for other persons who *might* pose a threat to the safety of the officers of the public. [Citations omitted, emphasis added.]

*Id.* at 1037.

Indeed, in our own jurisdiction, we upheld a sweep search occurring after the arrest of an armed robbery suspect who was found, unarmed, outside his residence. We there held:

> It would have been shoddy and even hazardous police investigation for the officers not to have secured the premises in order to determine whether or not fugitives or armed persons were present.

Johnson v. State, 97 Nev. 621, 624, 637 P.2d 1209, 1211 (1981).

Turning now to the facts of the case before us, deputies of the Carson City Sheriff's Department (CCSD) arrested appellant Hayes at his residence pursuant to a warrant for possession of stolen property. Earlier the same year, CCSD deputies had encountered resistance from Hayes in seizing an automobile in his possession. Prior to executing the warrant in the instant case, the arresting deputies met to discuss plans for accomplishing the arrest. Although Deputy Kugler did not discuss the possibility of Hayes being armed or other persons being present at the arrest scene, one deputy did mention Hayes' association with a felon by the name of Don Cisco and related an incident when Hayes had ordered Cisco from his property at gun point.

When the officers arrived at Hayes' residence, they noticed the presence of several vehicles in the vicinity. They also found a shotgun in the front yard of the premises. Approaching the residence with weapons drawn, the officers rapped on the front door. The door was opened by Hayes, who promptly attempted to retreat back inside the house, but then complied with the order of a deputy to step outside. Hayes was immediately arrested, handcuffed, and taken into custody. At that time, Hayes turned towards the house and started yelling the name "Dawn" (so spelled because subsequent events revealed the presence of Hayes' girlfriend and co-appellant, Dawn Richmond). In response, two deputies took cover next to the front door because of their stated belief that Hayes was calling for Don Cisco.

According to the testimony of record, the deputies then entered the residence to secure the premises for their own safety and that of their fellow officers. They quickly scanned the rooms for the presence of third persons. Dawn Richmond was discovered in a back room. During this process, the officers also observed a gun (which proved to be loaded) and contraband in plain view.

After observing the aforementioned evidence of criminal activity, the officers secured the residence and left to obtain a search warrant. In the subsequent search, officers seized contraband in the form of marijuana and methamphetamine, weapons, evidence of drug sales and other evidence indicative of an illicit drug operation. In short, the efforts of the officers produced the most cogent evidence of appellants' guilt, together with evidence (loaded weapons) of at least the potential for violent behavior by appellants.

In analyzing the reasonableness of the officers' actions, it is also important to note that the record evidence reflects that prior to the events in question, Hayes had not only been the subject of a criminal investigation for possession of stolen property which resulted in the necessity for physical restraint, but the arresting officers had also been informed that Hayes previously had been arrested for battery. Moreover, at least two of the deputies were aware of the prior incident when Hayes had threateningly shoved a shotgun up the nose of a person he thought to be a snitch. In addition, the CCSD was aware that certain of Hayes' associates were felons with a history of violence. Armed with this background information, the deputies approached Hayes' residence with caution and immediately noted numerous vehicles belonging to unknown parties, and a shotgun in the front yard.

Given the circumstances in which the deputies found themselves, I suggest that their decision to perform a sweep search was both eminently reasonable and entirely justified under the case authorities cited above. As the authority cited by the majority declares:

> Even if the crime for which the arrest was made is not that serious, a protective search elsewhere in the premises may be warranted because the police suspect others therein are engaged in much more serious conduct, *or* have good reason to conclude that there are weapons in the premises. [Emphasis added.]

2 LaFave, *Search and Seizure* § 6.4(c), p. 649. I suggest that the combination of factors mentioned above—the criminal background of Hayes and his associates, the presence of vehicles indicating a likely prospect of other persons in the residence, the

shotgun, Hayes' elusive behavior and his yell to a person named Don (Dawn)—should have led a reasonably cautious and prudent police officer to conduct a protective sweep search.

The majority rejects the State's position that the deputies formed a reasonable concern for their safety when Hayes shouted back to the house. Instead, they accept the reasoning of the 9th Circuit when it said "[i]t is not unreasonable for an individual to call into his house to his friends or relatives that he is being taken away." United States v. Basurto, 497 F.2d 781, 790 (9th Cir. 1974). However, the extent to which the 9th Circuit would defer to its ruling in *Basurto* as a continuing basis for relief is, at the very least, problematical. In the later case of United States v. Gardner, 627 F.2d 906 (9th Cir. 1980), the court widened its scope of permissible warrantless searches upon a showing of "specific and articulable facts which, taken together with the rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion." *Id.* at 910.

Unfortunately, without benefit of the insights gained by the trial judge as the trier of fact in this case, the majority has viewed the cold record and concluded that notwithstanding the judgment of the arresting deputies to the contrary, the officers could not have reasonably believed themselves to be in danger.[1] The majority has simply drawn all factual inferences against the deputies concerning the complex of factors existing at the arrest scene upon which the deputies based their judgement. The testimony of the arresting officers has been improperly re-weighed on appeal and found incredible, or this court has substituted its own dispas-

---

[1]The majority, without deference to the language quoted from other cases in this dissent, merely derives comfort from the fact that the circumstances of the cited cases presented an apparent need for greater caution than the instant case. Moreover, the majority consistently depreciates the validity of the testimony of officers concerning such matters as Hayes' known association with felons and the fact that Hayes was known to keep weapons in his place of residence. Finally, the majority wrongly concludes that I have inferred that the presence of weapons and contraband somehow justifies an otherwise unlawful search. In the latter regard, I have done nothing more than the 9th Circuit in suggesting that the presence of such items should give courts greater pause in second guessing circumstances as assessed by trained law enforcement officers. *See,* United States v. Castillo, 866 F.2d 1071, 1081 (9th Cir. 1988).

My major concern with the majority view is that little deference is given to the special expertise, sensibilities, and perceptions of the law enforcement officers, whose business it is to discern between alternatives under stressful and ofttimes perilous conditions. The trial judge heard the officers articulate their reasons for conducting a protective sweep, and I am convinced, as expressed elsewhere in this dissent, that the *Buie* standards were adequately satisfied, and that the trial judge was perceptive in finding no constitutional misconduct by the officers.

sionate analysis of the potential for danger to a set of circumstances that, in my view, must have given the deputies on the scene ample reason for caution. As we observed in *Johnson,* I would observe here, that it would have been shoddy and hazardous investigative methodology to have failed to perform an investigative sweep.

If, in fact, the deputies' fears concerning the possible presence of the felon Cisco (life is replete with examples of yesterday's enemies being today's friends) had proved accurate, the equation for violence would have been complete given the quantity of contraband and loaded weapons inside Hayes' residence. And no police officer should feel compelled to submit to the prospect of gunfire from the rear while exiting an arrest scene.

The majority emphasizes the fact that the officers were only concerned about possibilities, i.e., that a shotgun on the premises could indicate the possibility of other weapons inside the residence (there were), that the presence of numerous automobiles at the residence reflects only a possibility of other criminals inside Hayes' house (there was a criminal participant inside), despite the fact that Hayes was known to associate with violently disposed felons, and that Hayes' call to Dawn raised only a possibility that someone other than Dawn Richmond was being alerted. Indeed, the majority even goes so far as suggesting that it is normal for people in Nevada to own shotguns, the apparent message being that law enforcement officers should not be too concerned about the need for caution when a criminally accused who consorts with violent felons possesses such weapons.

It is not without significance that the officers in the instant case, during their swiftly conducted sweep of Hayes' premises, observed in plain view contraband and a loaded weapon. The officers had, in fact, vindicated their concerns by what was noted during both the protective search and the subsequent, comprehensive search pursuant to the issued warrant. The officers were in the midst of a flowering criminal enterprise supported by loaded weaponry. As stated by the court in United States v. Castillo, 866 F.2d 1071, 1081 (9th Cir. 1988):

> If nothing else, this discovery (cocaine, cash, and three loaded handguns) demonstrates the wisdom of this court's admonition that " '[c]ourts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.' " *Astorga-Torres,* 682 F.2d at 1335 (quoting *Coates,* 495 F.2d at 165).

In *Castillo,* the arrest was effectuated in the open doorway to a friend's apartment. Presumably, the officers could have simply

left the premises with a wary eye directed to their backsides as they departed with the accused. The court, however, did not mention retreat as a necessary consideration, an option, or a preference. It did, however, observe that an arrest near an open doorway, as occurred here, presented greater prospects of danger to officers than one occurring in areas removed from open doorways. More importantly, the court also noted, as part of its analysis in reviewing a trial court's determination that exigent circumstances existed to justify a warrantless entry into a residence, that:

> The trial judge's findings that certain facts occurred, the weight accorded to the evidence and the credibility of witnesses are reviewed under the deferential, clearly erroneous standard. . . .

*Id.* at 1079. Under a deferential, clearly erroneous standard, applicable here, I believe the findings of the trial judge who heard the testimony of the officers and determined it to be credible, should be sustained.

Finally, I do not consider the fact that one of the CCSD officers testified that sweep searches were standard procedure should blur this court's vision of what actually occurred anymore than it did with the trial judge. *See, e.g., Castillo,* at 1079. It is clear that protective sweep searches may not be sanctioned in the name of standard operating procedure, and if the deputies had no more to offer than that, I would have no difficulty in both condemning such conduct and invalidating the search.

For the reasons noted above, I am compelled to dissent from the ruling of the majority.