THE STATE OF NEVADA, Appellant, *v.* BARRY DAVID MILLER AND VICKY LYNN MILLER, Respondents.

No. 21145

July 7, 1994 877 P.2d 1044

[Rehearing denied October 25, 1994]

*Frankie Sue Del Papa,* Attorney General, Carson City; *Dorothy Nash Holmes,* District Attorney; *Scott W. Edwards,* Deputy District Attorney, Washoe County, for Appellant.

*Dennis E. Widdis,* Reno, for Respondent Vicky Lynn Miller.

*Kenneth V. Ward,* Reno, for Respondent Barry David Miller.

## OPINION

By the Court, STEFFEN, J.:

This appeal challenges a suppression order issued by the district court on grounds that a police search was nonconsensual and effectuated through a minor babysitter who had been made a police agent through the process of suggestion, and that the warrantless search was unauthorized. We conclude that the district court erred in its ruling and therefore reverse and remand.

### FACTS

In September 1989, twelve-year-old Jennifer was employed by respondents Barry David Miller and Vicky Lynn Miller to periodically babysit the Millers' two children, a three-year-old daughter and a five- to six-month-old infant son. Jennifer tended the children on a regular basis every week from Thursday through Sunday, day and evening, including times when Mrs. Miller slept prior to leaving for work on the graveyard shift. Jennifer's period of employment with the Millers continued through November 3, 1989, the date of the event constituting the basis for this appeal.

During the course of her employment at the Millers' apartment, Jennifer developed a sense of concern over what she perceived to be the possession, use and sale of marijuana by the Millers. Specifically, Jennifer testified at a grand jury hearing on November 8, 1989, that she: (1) first saw what she thought was marijuana on the coffee table in the living room of the Millers' apartment sometime prior to November 3, 1989; (2) periodically observed a "whole bunch of people coming over, [who] gave them [Vicky or Barry Miller] a few twenty dollar bills or some-

thing and they wouldn't let us see, so I figured that probably was it [marijuana];" (3) saw in the apartment a "big Raley's bag" inside of which was "a whole bunch of it [marijuana]" in "twenty or twenty-five" smaller ziplock bags; and (4) saw Barry Miller smoke it in front of her one time. Concerning the latter event, Jennifer testified that "I sort of acted like I didn't see it, but it smelled real bad, so—just, I just . . . tried to ignore it by pretending like playing with the baby and everything."

Jennifer also indicated that she had seen on television what they did to people who sell drugs, so she called Secret Witness but "they didn't do anything." The child also stated that she had observed the substance on numerous occasions but that "every time I went over there I wanted to prove myself wrong [and that] they didn't have it [marijuana]."

During the evening of November 3, 1989, while the Millers were both at work, Jennifer dialed 911 for help since she had received no contact from her call to Secret Witness "a few weeks" earlier. In talking to the police, she discussed the suspected marijuana and asked for police assistance. Reno Police Officer Jay Brown told the grand jury that he was dispatched to the Millers' apartment in response to Jennifer's call to 911, with the understanding that "[a] juvenile had called dispatch and said she had found what she thought was drugs and would like to talk to a police officer."

After arriving at the Millers' apartment, Officer Brown knocked on the door and was greeted by a young female (Jennifer) who acknowledged that she was the babysitter who had called the police. The officer, at his request, was invited into the residence by Jennifer. Upon entering, Officer Brown asked the child "where is what you think is [sic] drugs?" and Jennifer then "went in the back bedroom," with the officer following, and obtained an opened grocery bag, which she handed to the officer. Officer Brown testified that he looked into the already opened bag and observed a substance inside that smelled like marijuana. The contraband was packaged in six individual plastic baggies. Brown also noted one larger plastic baggie containing twenty-four smaller rolled up quantities of what he believed to be marijuana. The officer seized this evidence together with numerous items of drug paraphernalia also voluntarily given to him by the babysitter.[1]

---

[1] The drug paraphernalia consisted of (1) a pipe cleaner with marijuana residue, (2) a measuring scale, (3) a rolling machine, (4) a roach clip with marijuana residue, (5) scissors commonly used for cutting marijuana buds, (6) rolling paper listing names with dollar amounts, (7) film canister with marijuana residue, and (8) sheets of paper listing various names with dollar amounts, possibly used to keep track of sales of the drug.

At the grand jury hearing, a police expert on narcotics testified that the

Officer Brown also testified that as he "was standing holding the bag, a man [Barry Miller] walked in," and in response to the officer's inquiry, admitted that the items in the bag belonged to him.

At the suppression hearing on May 31, 1990, Officer Brown testified that he "was right at the entrance to the bedroom, where the little girl handed me the bag . . . and about the same time Mr. Miller walked through the front door." Further questioning elicited an admission from the officer that he entered the master bedroom "just maybe a foot or two," following Jennifer who continued telling him that the marijuana was in the master bedroom. Although Officer Brown first denied asking the babysitter to show him the suspected drugs, upon reading his testimony before the grand jury, he conceded that he did ask the girl "where is what you think is [sic] drugs."

During his suppression hearing testimony, Officer Brown also emphatically denied that he and Barry Miller arrived at the Millers' apartment at the same time. Brown stated that Mr. Miller arrived approximately three to five minutes after the officer had entered the apartment. Although Jennifer did not testify at the suppression hearing, she had earlier stated in her sworn testimony before the grand jury that "right when he [Officer Brown] got there, Barry walked in the house and they had to arrest him and everything." In response to questions concerning what could be seen as a discrepancy between the testimony of the officer and the babysitter, Brown emphasized the accuracy of his testimony, again stating that Mr. Miller arrived several minutes after Officer Brown, and that Jennifer "would be incorrect in terms of when Mr. Miller arrived." The officer then explained that "through her eyes it might have been simultaneously, yes, I could see how that could possibly happen. She was very upset at the time." Since the child stated that when Barry Miller walked into the house "they had to arrest him," it seems apparent that the officer must have already seen the contraband or there would have been no basis for an arrest at that point. Indeed, the officer testified that he showed the bag to Mr. Miller and asked if it belonged to him. Miller acknowledged that it did and he was then placed under arrest.

Officer Brown testified that once he realized a felony was involved and a juvenile was present, he called for his supervisor. The officer indicated that he placed the call after he had arrested Mr. Miller.

Barry Miller's testimony at the suppression hearing indicated

paraphernalia seized by Officer Brown indicates that "these people are probably selling the baggies of marijuana based upon the numbers," and that the "pipe, scales, rolling machine, zig zag papers, hemostats and the remainder would probably be for personal use."

that on the evening of his arrest, he arrived home and saw a patrol car parked in the parking lot and two officers walking towards his apartment. He stated that as the officers were closing the door, he started pushing the door open and then the officers let him in. Continuing, Mr. Miller said the officers asked him if he lived there, and after acknowledging that he did, they inquired about his name and then asked him to stand over by a chair. Mr. Miller said that he was asked no more questions until they showed him a paper bag and inquired if it belonged to him. He also testified that he was never asked if the police could search his room and that he never gave them permission to do so.

Mrs. Miller testified that Jennifer was instructed specifically to "stay out of our room [master bedroom]" and that Mrs. Miller kept the door to their bedroom closed whenever she was away from the apartment. Mrs. Miller also stated that Jennifer did not have a key to the apartment; that the babysitter was permitted to have one specific friend or her mother visit her at the apartment while she was babysitting.

The Millers were each charged with felony counts of possession of a controlled substance, possession of a controlled substance for sale, and one gross misdemeanor count of willfully endangering a child as the result of abuse. Following the suppression hearing, the district court granted the motion to suppress, stating that the circumstances amounted to a warrantless and unauthorized search of a private residence by police.

## DISCUSSION

The overarching issue on appeal is whether the district court erred in granting respondents' motion to suppress. The resolution of this issue requires an analysis of the relationship between the babysitter and the police. Preliminarily, we note that findings of fact in a suppression hearing will not be disturbed on appeal if supported by substantial evidence. Tomarchio v. State, 99 Nev. 572, 575, 665 P.2d 804, 806 (1983). Moreover, a district court's findings of fact will be reviewed under a deferential standard. Hayes v. State, 106 Nev. 543, 550 n.1, 797 P.2d 962, 966 (1990). Issues concerning exigent circumstances, consent, and whether an individual is acting as an agent for the police present mixed questions of fact and law. Id. Recognizing the sanctity of the home, and the heightened application of the Fourth Amendment to a person's residence, the district court noted that police authorities had prior knowledge that there may be drugs in the Millers' home. Moreover, the district court concluded that

the juvenile was made the hands and feet of the police by the process of suggestion. The girl had located the drugs, but it

took the suggestions of the police, the gentle persuasion of their movements and presence inside the home for her to bring the drugs to them from the sanctity of the bedroom into the hands of the government agents. I do not say the motives of police were suspect. It's just the way things happened.

Describing the suppression issue as a "very close case," the district court concluded that the "compelling factor" was powerfully expressed by the oft-cited ancient quote from William Pitt indicating that even the poorest man in his cottage is safe from the prospect of the king's forces crossing the threshold of his "ruined tenement." The quote referenced in full by the district court is indeed both powerful and cherished in this state and nation where the forces of government are circumscribed in their power to intrude upon the sanctity of the home.

Nevertheless, in a society awash with crime fueled by the use and sale of illicit drugs, it is fortunate indeed, that the governmental right to search and seize is permissible when "reasonable." This premise places in context the ruling by the district court that the police, through suggestion and gentle persuasion and movements, made twelve-year-old Jennifer "the hands and feet of the police." We are constrained by the facts and the law to disagree.

The babysitter had been repeatedly exposed to the possession, sale and use of what she feared was an illegal substance by the insensitively brash parents of the infant son and three-year-old daughter Jennifer had been hired to shepherd. Fearful and uncertain, Jennifer called Secret Witness to help with her dilemma. Unfortunately, Secret Witness proved unresponsive, and as the suspected drug activity continued, Jennifer eventually called 911 to ask the police for help.

Officer Brown was dispatched to the Millers' apartment as a result of Jennifer's call for assistance. It appears clear that the officer could not have obtained a search warrant at this point, for the caller, who was obviously a young juvenile, may have been wrong in her inexperienced evaluation of what she had been observing. It is equally clear that the child was acting out of respect for the law, and that the police had previously experienced no contact with Jennifer, nor had they sought through some means to promote her cooperation in uncovering any criminal conduct. Likewise apparent is the fact that Officer Brown could not have either confirmed or allayed young Jennifer's fears without asking to see what it was that she was calling about.[2] In short,

---

[2] Officer Brown testified at the suppression hearing, without contradiction, that Jennifer had indicated in her 911 call that she had found what she *thought was possibly drugs.*

Officer Brown did not make Jennifer "the hands and feet of the police" or a police agent by responding to *her call* concerning what she feared might be the presence of illicit drugs in the apartment where she was babysitting. The officer testified that Jennifer promptly told him that "it's in there," after which he followed her to the bedroom where she secured the bag containing the subject of her concerns. Upon handing Officer Brown the grocery bag, he saw immediately that it was full of baggies of marijuana.

The United States Supreme Court has held that the Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any government official." United States v. Jacobsen, 466 U.S. 109, 114 (1984). It is clear that the disjunctive prong of the ruling pertaining to acting as a government agent is satisfied in the instant case. Jennifer was acting purely out of her concern for what she feared was the maintenance of illicit drugs by the Millers in the apartment where she was employed to tend their two small children. The facts of record provide no predicate for finding an agency relationship between Jennifer and the police.

Apropos to this issue are two rulings by the United States Supreme Court declaring that evidence secured wholly on the initiative of a private person is admissible, Burdeau v. McDowell, 256 U.S. 465, 475 (1920), and that

> [i]t is no part of the policy underlying the fourth and fourteenth amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. . . . There was not the slightest implication of an attempt on their [police] part to coerce or dominate her . . . or direct her actions . . . .

Coolidge v. New Hampshire, 403 U.S. 443, 488-89, *reh'g denied*, 404 U.S. 874 (1971). Applying the quoted provisions to the instant case, it is uncontroverted that Jennifer not once, but twice, initiated contact with law enforcement in order to have the police examine what she thought might possibly be illegal drugs. In responding, the police simply accommodated the babysitter's desire to have them inspect the object of her concerns.

Moreover, society would receive a sad message indeed, if a child like Jennifer who sought to act responsibly after being exposed to what appeared to be the possession, sale and use of drugs at her place of employment, would be rebuffed by the law on grounds that her concerns were simply transmuted into an unlawful tool of the police whom she had called for assistance. It was in the highest tradition of good citizenship when Jennifer,

despite her fears,[3] had the courage and good sense to summon the police for help in determining whether her suspicions were well-founded. As observed by the Court in *Coolidge*, it is in no sense the policy of the Fourth or Fourteenth Amendments to discourage citizens from assisting in the apprehension of criminals. Moreover, there is not the slightest indication in this record that Officer Brown sought to coerce or intimidate Jennifer in order to override her will and secure her involuntary cooperation. To the contrary, even the district court ruled that Jennifer became the "hands and feet of the police" through suggestion and gentle persuasion.

For the reasons noted, there is no evidentiary basis for concluding that Jennifer became either a willing or unwilling agent of the police. The babysitter initiated a private search for the contraband that violated neither the federal nor the Nevada Constitution. Moreover, the child presented the contraband to Officer Brown who was fully justified in seizing it as evidence. The district court clearly erred in ruling to the contrary.

The State also contends that even in the absence of a validating private search and seizure, the contraband should not have been suppressed because Jennifer provided Officer Brown with a valid, third-party consent to enter and search the Millers' apartment. We need not address this issue since our resolution of the first issue is dispositive of the State's appeal. We nevertheless note in passing that both the facts and the law provide a sound basis for agreeing with the State's position.

Finally, we have concluded that the State's contention with regard to exigent circumstances as a basis for validating the search of the Millers' apartment is without merit and need not be addressed.[4]

## CONCLUSION

For the reasons discussed above, the order granting respondents' motion to suppress is reversed, and this matter is remanded to the district court for further proceedings.

Rose, C. J., and Springer, J., concur.

---

[3]Officer Brown testified at the suppression hearing that after Jennifer handed him the open bag containing the marijuana, "the little girl started to cry, and I was trying to comfort her, telling her she did the right thing. She was, she was highly upset . . . ." It is not difficult for this court to understand how the child must have felt in calling the police to come and see whether the parents of the two children she was tending were engaged in criminal conduct.

[4]By our order of July 5, 1990, we directed the State to address the issue of whether this court had jurisdiction to entertain this appeal based upon considerations of timeliness. We have concluded that notices filed with the district court and this court were both timely, thus eliminating the question of jurisdiction as an issue.

YOUNG, J., with whom SHEARING, J., joins, dissenting:

My colleagues conclude that the search of the Millers' bedroom was not subject to constitutional protections because it was perfected by a private citizen. The majority relies upon United States v. Jacobsen, 466 U.S. 109 (1983), to support this proposition. I believe that this rationale is flawed. I respectfully submit that the principles established by *Jacobsen* are simply inapplicable to the instant case.

In *Jacobsen,* Federal Express employees inadvertently opened a customer's parcel and found what they suspected was cocaine. The employees resealed the package and summoned federal authorities. An agent of the Drug Enforcement Administration later reopened the parcel, without a warrant, at the Federal Express office. The Supreme Court upheld the validity of this search, reasoning that the Constitution was not violated when a government agent reenacted a search conducted by private individuals. The decision established the general principle that the government has the right to conduct independent searches no greater in scope than that performed by the private actor. *Id.* at 120.

There is a key distinction between *Jacobsen* and the instant appeal that is ignored in the majority opinion. In *Jacobsen,* the search was reenacted by a government official at the parcel service's offices. The official was properly invited onto the premises and was free to perform the same type of search conducted by Federal Express employees. In the case at bar, however, Officer Brown's reenactment of the search was performed in the Millers' home. Jennifer was not merely allowing the police to reenact a private search of an unopened paper bag, she was waiving any privacy interests that the Millers had in their bedroom. This far exceeded Jennifer's initial discovery and search.[1]

---

[1]This distinction was tacitly recognized in *Jacobsen.* Reacting to concerns expressed by his colleagues, Justice Stevens, writing for the majority, expressed a limitation to the Court's holding:

> We reject Justice White's suggestion that this case is indistinguishable from one in which the police simply learn from a private party that a container contains contraband, seize it from its owner, and conduct a warrantless search which, as Justice White properly observes, would be unconstitutional. Here, the Federal Express employees who were lawfully in possession of the package invited the agent to examine its contents; the governmental conduct was made possible only because private parties had compromised the integrity of this container.

*Jacobsen,* 466 U.S. at 120 n.17.

With these comments, the court identified a distinction where the container is compromised but other expectations of privacy remain intact. Such is present in the instant case, where Jennifer's search compromised the integrity of the paper bag but the sanctity and expectation of privacy in the bedroom remained undisturbed.

Surely, any time a private citizen fortuitously discovers evidence of contraband at another's home, they are not free to invite police in for a romp around the connubial bed. *See* Wayne R. LaFave, Search and Seizure § 1.8(b), at 188 (2nd ed. 1987). The Fourth Amendment simply affords more protection to an individual's residence.

The error of the majority's reliance on *Jacobsen* is aptly illustrated by the Colorado Supreme Court's decision in People v. Brewer, 690 P.2d 860 (Colo. 1984). In *Brewer,* a landlord conducted a private search of a tenant's apartment after the tenant had apparently abandoned the residence. Within the apartment, the landlord found a shoe box containing marijuana. She summoned the police and admitted them into the apartment, where they seized the marijuana that the landlord had privately discovered. In holding that the search was unlawful, the *Brewer* court rejected the State's reliance upon *Jacobsen.* The court agreed that the landlord's initial search was a private endeavor not subject to constitutional restrictions. *Id.* at 862. However, the court properly recognized that allowing the police into the residence to search for, and retrieve, the marijuana involved a different constitutional question. While the integrity of the shoe box was compromised by the private search, the expectation of privacy in the apartment remained intact. The real issue on appeal was whether the landlord had the authority to consent to a search of the premises. The court ultimately held that the landlord did not have such authority and invalidated the search. *Id.* at 862-63; *see also* State v. Miggler, 419 N.W.2d 81 (Minn. Ct. App. 1988) (distinguishing *Jacobsen* on grounds that police entered home of suspect to reenact search conducted by private individual).

Like *Brewer,* and without the controlling influence of *Jacobsen,* the real issue of this appeal is whether twelve-year-old Jennifer had the authority to consent to a search of her employers' bedroom. The majority summarily dismisses this issue, stating that Jennifer provided Officer Brown with a "valid, third-party consent to enter and search the Millers' apartment." Again, I respectfully submit that the majority's conclusion is incorrect.

The government has the burden of establishing the effectiveness of a third party's consent. Illinois v. Rodriguez, 497 U.S. 177 (1990). It can accomplish this task in three ways. First, the government can come forward with evidence of both joint access and shared use or control over the area that was searched. *See* United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). Such a showing would demonstrate that the third party had actual authority to consent. Second, it can show that the owner of the property to be searched expressly authorized the third party to give consent. Finally, the government may establish valid consent by

means of the "apparent authority doctrine." There, a search is valid if the officer reasonably believes that the third party has actual authority to consent. *Rodriguez,* 497 U.S. at 188.

After examining these three different possibilities of consensual authority, the flaw in the majority's analysis becomes clear. First, there is nothing in the record indicating that Jennifer had shared access to, or control over, the Millers' bedroom. To the contrary, the Millers presented evidence at the suppression hearing that Jennifer was specifically instructed to stay out of their bedroom. Vicky Miller testified that she regularly shut the bedroom door before she left for work. In light of these simple facts, and understanding the general restrictions placed upon a twelve-year-old babysitter, I cannot conclude that Jennifer had the actual authority to waive the Millers' constitutionally protected right to be free from warrantless searches of their bedroom. *See* State v. Rodrigues, 692 P.2d 1156, 1157 (Hawaii 1985) (babysitter did not have actual authority to consent to a search of resident's bedroom where she never had access to the subject room); *see also* People v. Litwin, 355 N.Y.S.2d 646, 649 (N.Y. App. Div. 1974) (babysitter had no authority to consent to search of employer's home). Second, there is nothing in the record indicating that the Millers authorized Jennifer to consent to the search. Finally, and most importantly, it was not reasonable for Officer Brown to believe that a twelve-year-old babysitter had the authority to waive the constitutional protections of her employer. *See, e.g.,* People v. Jacobs, 729 P.2d 757, 763 (Cal. 1987) (eleven-year-old girl does not have the actual or apparent authority to consent to search of parent's home). The record indicates that the officer entered the house and almost immediately followed young Jennifer into the connubial resting place. Officer Brown had knowledge that Jennifer was only the babysitter and was not a resident of the house. In addition, he surely noticed that Jennifer was a young girl. Yet in spite of this information, Officer Brown never once questioned Jennifer regarding her responsibility or authority over the household or bedroom. I submit that it was unreasonable for Officer Brown to summarily determine that Jennifer had the authority to invite him into the most private parts of the Millers' home. The Constitution prohibits police officers from plowing through ambiguous situations and later claiming ignorance or "reasonableness" when an issue arises regarding the consensual authority of a third party. In fact, the Constitution mandates that officers ask questions to dispel any concerns they may have about whether the third party has authority to consent. *See* United States v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991).

In its ruling, the district court determined that there was not valid consent to the search of the Millers' home. The conclusion

rested upon factual determinations made by the court after considering the testimony of Officer Brown and the factual climate of his visit to the Millers' residence. There is nothing in the record on appeal indicating that the findings of the district court were clearly erroneous. United States v. Botero, 589 F.2d 430, 433 (9th Cir. 1978) (findings of fact at a suppression hearing will not be disturbed on appeal unless clearly erroneous), *cert. denied,* 441 U.S. 944 (1979).

Unlike the majority, I cannot conclude that the government carried its burden in proving that the third-party consent of young Jennifer was valid. The Constitution affords the Millers more protection in their home. Their fundamental right to be free from warrantless searches of their residence cannot be waived by a twelve-year-old temporary employee. I agree with the district court's sound rationale and its recognition of this issue as fundamental to our culture of individual freedoms. I also share the lower court's admiration for the immortal words of William Pitt concerning the sanctity of the tenement:

> The poorest man may in his cottage bid defiance to all the forces of the Crown.
> It may be frail—its roof may shake—the wind may blow through it—the storm may enter—the rain may enter—but the King of England cannot enter!
> All his forces dare not cross the threshold of the ruined tenement.[2]

For the foregoing reasons, I would affirm the district court's ruling.

[2]William Pitt, the elder, Earl of Chatham, Speech in the House of Lords (1763).