BRIAN SIMMONS, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 24932

February 29, 1996                            912 P.2d 217

[Rehearing denied May 30, 1996]

*William G. Rogers* and *Mark E. Haines,* Carson City, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Robert E. Estes,* District Attorney, and *Keith Loomis,* Special Deputy District Attorney, Lyon County, for Respondent.

## OPINION

By the Court, STEFFEN, C. J.:

Appellant Brian Simmons, a friend and high school classmate of murder victim Jason Kopack, challenges his jury convictions of first-degree murder with use of a deadly weapon, burglary, and possession of an explosive device, on Fourth and Sixth Amendment grounds, and also contends that his new trial motion should have been granted because the State suppressed evidence favorable to his defense. Concluding that Simmons' contentions are without merit, we affirm.

### FACTS

On the morning of February 23, 1993, fifteen-year-old Jason Kopack was murdered in Lyon County, Nevada. The Lyon County Sheriff's office investigation of the crime scene indicated no signs of a struggle, but the victim's body revealed an oval-shaped wound in the back of the left shoulder. The investigating officers initially believed that Jason had been mortally wounded with a crowbar or blunt instrument and began searching the premises for such an implement. During the course of the investigation, officers contacted Kopack's neighbors for additional clues. One neighbor, a Mr. Bradley, who lived only thirty feet

from the victim's trailer, reported that he had heard nothing out of the ordinary during the previous night. There was no written report generated from this interview, and the substance of the conversation with Bradley was not relayed to the defense.

X-rays of the victim revealed the presence of several #6 shotgun pellets, and plastic wadding from a 20-gauge shotgun was recovered from the body during the subsequent autopsy. Jason had apparently been shot from a distance of two to eighteen feet at around 1:30 a.m., the same time that Jason's father was startlingly awakened by what he thought was wind-related noise or a cat jumping on the roof of a shed.

At school during the morning of the same day, Simmons, who had reportedly become preoccupied with Satanism, mutilation, rape and killing,[1] attended school and told or suggested to three friends that he had killed Jason. Simmons' friend, Mike O. (hereafter "Mike"), testified that Simmons explained the details of his activities leading up to the shooting, and admitted to Mike O. that he, Simmons, had shot Jason. Another of Mike O.'s acquaintances, Dan, testified that Simmons told him that there were now only four left on the list of five that Simmons had earlier told Dan that he intended to kill. This corroborated Mike O.'s testimony indicating that Simmons had told him, about two weeks before the killing, that Simmons had made a list of five people he planned to kill, including the victim, Jason. Dan also testified overhearing Simmons tell Mike O. that "I did it, I did it," and that he was so close he could not have missed. In addition, Dan overheard Simmons telling Mike O. that he wanted to tell everybody, but knew that he would be caught if he did.

Another friend by the name of Michael B. had been previously advised in some detail by Simmons of his plans to murder a "long-hair" (the victim had long hair), and that he hoped to do it by staying awake and driving his mother's car to the victim's house if it had enough gasoline. On the same morning, Michael said he saw Simmons approaching and asked him why he was smiling. Simmons told him that he would soon find out. These three witnesses reported Simmons' comments to sheriff's officers.[2]

---

[1] In handwritten journals admitted into evidence, Simmons had copied satanic invocations from books and expressed his desire to please Satan by murdering and mutilating people he knew. He reportedly told the victim's girlfriend that if Satan told him to kill someone, including Jason, he would do so. Simmons shared his murder plans with other friends, and told his friend, Dan, that he had a list of five individuals that he planned to kill in the near future.

[2] We will later respond to some of the concerns expressed by our dissenting colleague, JUSTICE SPRINGER. The dissent concludes that there is insufficient evidence to satisfy the criminal burden of proof against Simmons. First, we

On February 25, 1993, sheriff's deputies searched Simmons' residence pursuant to a search warrant. In Simmons' closet, they found a recently-fired shotgun containing an expended 20-gauge Federal Firearms #6 shotgun shell (with a non-Federal primer).[3] They also discovered in a plastic bag wet shoes with a tread design resembling a sheriff's deputy's description of the tread imprinted on the snow near the entry to Jason's trailer. Additionally, the officers seized a pack of filterless cigarettes, a bottle of oil allegedly used in an attempt to burn down the Kopack residence, journals with Satanic symbols, books on Satanism, including the book *Witchcraft,* and a derringer. The search also uncovered a pipe bomb, which was later disposed of by a bomb squad.

Simmons was subsequently arrested and charged with murder with the use of a deadly weapon, burglary, and possession of an explosive device. Appointed counsel invoked Simmons' Sixth Amendment right not to be questioned without counsel, and a notation to that effect was entered on Simmons' jail folder.

---

note that Simmons has not challenged the sufficiency of the evidence. Second, when such a challenge is urged on appeal, "[t]he relevant inquiry for the court is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Unfortunately, the dissent turns the appropriate standard of review on its head, overlooking important matters of evidence and testimony, and then viewing the evidence in a light most favorable to the defendant.

As an illustration, the dissent maintains that Simmons' first-degree murder conviction depends "almost entirely on the testimony of his teen-age acquaintance, 'Mike,' who claims that Simmons admitted to him that he shot and killed Jason Kopack." Importantly, the dissent fails to even mention the testimony of Dan, noted above in the text of this opinion. Dan was a recipient of the Nevada Scholar Award for placing in the top five percent in the ACT college entrance exam. Although a classmate of Simmons', Dan testified that he first met Simmons and Mike O. in a choir class during the second semester of their senior year. Dan testified that he never socialized with Simmons, Mike O. or the victim, Jason Kopack, either outside or inside the school. It could be strongly argued that the conviction in this case could be sustained on the testimony of Dan alone. In any event, there is not the slightest hint that Dan was anything other than a truthful, disinterested witness.

The dissent appears to believe that Mike O. may have framed Simmons for Jason's murder. Of course, one of the problems with such a theory is that any such "frame-up" would have to include a conspiracy between Mike O., Michael B., and Dan. How could the dissent otherwise explain the corroborating testimony of Dan and Michael B.? There is simply no evidence of a conspiracy in the record.

[3]Simmons explained that he went shooting in an open field the previous month and after firing the gun once, he could not remove the unejected shell, which was still in the gun when the police seized it.

While Simmons was in jail, Simmons' girlfriend, Jessica, and one of his best friends (Mike O.), talked at school. Mike O. testified that Jessica told him that Simmons wanted to talk to him by telephone. After school, Mike O. asked his father what he should do, and his father told him to report the matter to Officer John Arndell at the Lyon County Sheriff's office. The officers, desiring to record Simmons' version of events, obtained judicial approval to intercept the telephone conversation after the court found probable cause to believe that Simmons would discuss the pending charges. Mike O. testified that he consented to the intercept "[t]o see—in case [Simmons] said anything about Jason, and just for my protection and my family's protection." Mike O., his father and Officer Arndell testified that Mike O. was told that he did not have to accept Simmons' call and that no agreement concerning lenient treatment for Mike O.'s prior substance abuse convictions was ever mentioned. Prior to the conversation, Officer Arndell instructed Mike O. not to intentionally seek to obtain incriminating evidence from Simmons, but rather to just be a listening post. During the conversation, however, Officer Arndell did nothing to restrain Mike O. from eliciting incriminating information.

In calling from the jail, Simmons knew that the conversation was subject to interception by jail authorities. During his call to Mike O., Simmons professed innocence and vowed revenge against the conspirators who had caused his plight. Apart from threatening people who had gone to the police and speaking in threatening tones, Simmons never made an incriminating remark. He mentioned that only he, Satan and God knew what actually happened. Occasionally, Simmons would question Mike O. on how long someone could survive a gunshot wound or a suffocation or other issues involving death. These somewhat desultory statements were uttered after Simmons perused the coroner's reports. Simmons appeared to be trying to contrast facts that he believed were inconsistent with his arrest. Aside from these remarks, the conversation was a typical one between two friendly teenagers.[4]

Before trial, Simmons moved to prohibit the State from admitting the recorded telephone conversation in evidence. Simmons insists that the State knowingly violated his Sixth Amendment right to counsel by recording the conversation. Specifically, Simmons underscores the first excerpt where Mike O. states, "Did Jason move or anything?" as an example of Mike's effort to elicit incriminating information.

---

[4]Excerpts of the conversation between Simmons and Mike O. are at issue on appeal and are set forth under Appendix A to this opinion.

The district court denied Simmons' motion, finding that: (1) the State's involvement with Mike O. was not sufficient to create an agency relationship; (2) there was no agreement between the State and Mike O.; (3) the State did not instruct Mike O. to elicit information from Simmons; (4) Mike O. voluntarily chose to receive Simmons' call, and (5) Mike O. never elicited incriminating information during the intercepted communication. Therefore, the district court concluded that Simmons did not show that the statements were deliberately elicited from Simmons by an agent of the State.

In closing argument, the State used the conversation to depict Simmons as threatening and anxious to inflict punishment on those who conspired to put him in jail. Additionally, the State posited to the jury:

> [I]s that tone that you heard on that conversation, is that consistent with an innocent boy wrongfully accused of a serious crime? Absolutely not. That tone is consistent with a person who has committed a murder and is doing everything he can to desperately work his way out of it.

Simmons also sought, unsuccessfully, to have the district court suppress all items taken from his home, including the book *Witchcraft,* from which the State read excerpts at trial to demonstrate that Simmons was involved in Satanistic rituals. In denying Simmons' motion to suppress, the district court found that all items had been properly seized and removed from Simmons' house and that the book *Witchcraft* was both in plain view and constituted relevant evidence.

At trial, Simmons did not deny telling his friends of his "hit" list, but testified that he referred to the names on the list only as characters in the game "Dungeons and Dragons." He insisted that all of his talk about Satan and Satanism was also simply part of the game. Simmons also testified that his friends lied about him telling them that he killed Jason.

During trial, the State informed the defense, for the first time, that a video tape recording of the crime scene had been made on the morning of Jason's death. This tape was admitted into evidence and, among other things, the judge noted the sounds of dogs barking in the background (presumably dogs belonging to Bradley, the neighbor who told investigators that he had not heard anything unusual).

Soon after the jury commenced its deliberations, the jurors submitted a note to the judge asking, "Did anyone hear the dog barking the night of February 23 in the area of the KOPACK residence?" The court discussed the question with counsel and all agreed that the question would not be answered. After deliber-

ating for a total of ninety minutes, the jury found Simmons guilty of all charges.

Simmons was sentenced to life in prison without the possibility of parole for his first-degree murder conviction, and received an identical consecutive sentence for use of a deadly weapon in the murder. Simmons was also sentenced to a ten-year term for burglary and a three-year term for possession of an explosive device, both of which are to run concurrently with the life sentences.

After his convictions and sentencing, Simmons discovered that Bradley had been interviewed by investigators on the morning of Jason's murder. At a post-trial hearing on a motion for a new trial based on newly discovered evidence, Bradley testified that he lived approximately thirty feet away from the Kopack's trailer, that he slept on the side nearest to his neighbor's trailer, and that his dogs barked "quite a bit." Moreover, Bradley testified that he had not heard anything during the night of Jason's murder and that had anything occurred, the dogs probably would have reacted by scratching on his door. The district court, finding that there was ancillary evidence at trial indicating that no neighbors had heard or seen anything unusual that night, that the defense had sufficient opportunity and funds to interview Bradley before the conclusion of the trial, and that the evidence probably would not have changed the outcome, denied Simmons' motion for a new trial.

On appeal, Simmons assigns prejudicial error to the district court's rulings (1) refusing to exclude the taped conversation between Simmons and Mike O.; (2) admitting the book *Witchcraft;* and (3) denying his motion for a new trial.

## DISCUSSION

*Whether the district court's admission of Simmons' intercepted telephone conversation violated Simmons' Sixth Amendment right to counsel.*

The United States Constitution provides that every person accused in a criminal prosecution shall enjoy the right "to have the Assistance of Counsel." U.S. Const. amend. VI. This right extends to State prosecutions under the Due Process Clause of the Fourteenth Amendment. This court has stated, " '[a]t the very least, the prosecutor and police *have an affirmative obligation* not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.' " Coleman v. State, 109 Nev. 1, 4, 846 P.2d 276, 278 (1993) (quoting Maine v. Moulton, 474 U.S. 159, 171 (1985)).

A defendant is denied his Sixth Amendment right to counsel if,

once the right attaches, government agents "deliberately elicit" incriminating statements in the absence of defendant's attorney. Massiah v. United States, 377 U.S. 201, 206 (1964); *see also* Emmons v. State, 107 Nev. 53, 58, 807 P.2d 718, 721 (1991) (quoting Thompson v. State, 105 Nev. 151, 156, 771 P.2d 592, 596 (1989) (incriminating statements made to jailhouse informant acting on his own initiative and without agreement with State may be used without violating state or federal constitutional rights)). The determination of whether a person is a State agent "must be made under the facts and circumstances of each case." United States v. Taylor, 800 F.2d 1012, 1015 (10th Cir. 1986). Moreover, "[i]ssues concerning exigent circumstances, consent, and whether an individual is acting as an agent for the police present mixed questions of fact and law." State v. Miller, 110 Nev. 690, 694, 877 P.2d 1044, 1047 (1994) (citing Hayes v. State, 106 Nev. 543, 550 n.1, 797 P.2d 962, 966 (1990)).

The State argues that Mike O. was not a State agent and that any incriminating statements Simmons made to his friend could therefore be used as evidence without violating Simmons' right to counsel. The State supports its position by first noting that law enforcement officers did not invite Mike O. to make the call. It was only after Mike O. found out from Simmons' girlfriend that Simmons wanted to talk to him that Mike O. informed the police of the situation. Second, at the time of the intercept, Mike O. had the option whether to pick up the receiver and accept the call from Simmons, with no pressure from the State. Third, the State did not enter into any type of agreement with Mike O. or instruct him how to proceed (other than telling him not to seek incriminating information from Simmons). The State thus concludes that substantial evidence supports the district court's finding that Mike O. was not an agent of the State and that this finding should not be disturbed on appeal.

Simmons presents the contrary argument that when Mike O. invited the police into his home to surreptitiously monitor the call in order to inculpate him, and thereafter accepted Simmons' call knowing that it would be intercepted by the police, Mike O. entered into an agreement with the police that made him an agent of the State. *See* Holyfield v. State, 101 Nev. 793, 798-804, 711 P.2d 834, 837-41 (1985) ("upon agreeing to foster police efforts to inculpate Holyfield, [Jacobs] became an agent of the police" (for Fifth Amendment purposes) because police placed him near Holyfield to seek incriminating statements and expected him to do so (because of his past experience as an informant and his relationship with Holyfield) even though police told him not to question Holyfield). Moreover, Simmons contends that a *quid pro quo* agreement was unnecessary to elevate Mike O. to the status

of an agent. *See* State v. Currington, 746 P.2d 997, 1003-04 (Idaho Ct. App. 1987) (lack of monetary compensation notwithstanding, informant was deemed an agent whose acts were attributable to the State where informant followed the State's instructions in recording defendant, used State equipment to record, and promptly returned recording to the State). Simmons nevertheless notes that despite the lack of necessity to show that Mike O. was receiving a *quid pro quo* from the police, Mike O. was a juvenile probationer who was familiar with the justice system and potentially had something to gain through cooperation with law enforcement authorities.

Simmons also cites the case of State v. Mattatall, 525 A.2d 49 (R.I. 1987), *cert. denied,* Mattatall v. Rhode Island, 506 U.S. 838, 113 S. Ct. 117 (1992), where the Rhode Island Supreme Court affirmed the appellate court's reversal of a trial court's finding that the informant was not a government agent. In *Mattatall,* an informant voluntarily informed police of defendant's actions, and subsequently invited the police to intercept a conversation in which the informant questioned the defendant about the charges. *Id.* Since Mike O. also initially contacted the police about Simmons, invited the police to listen in on the conversation and posed numerous questions to Simmons likely to elicit incriminating remarks, Simmons deduces that Mike O. must be considered a State agent.

We disagree and conclude that the district court did not err in determining that Mike O. was not an agent of the State. First, substantial evidence supports the district court's finding that Mike O. did not initiate the call from Simmons. Mike O. testified that Simmons' girlfriend told him that Simmons wanted to call him, and Mike O., apparently concerned about such a conversation, asked his father about the course of action he should follow. Second, there is no evidence of any *quid pro quo* resulting from Mike O.'s cooperation with the police. Mike O. voluntarily informed the police about the pending call. In addition, the police, Mike O. and his father testified that no agreement materialized between Mike O. and the police in exchange for his cooperation and consent to intercept the phone call. Finally, there is no evidence that the police coerced or baited Mike O. into receiving Simmons' phone call or continuing in his conversation with Simmons. Prior to the phone call, the police only requested that Mike O. refrain from seeking to elicit incriminating information from Simmons. Mike O. voluntarily spoke to Simmons and no evidence suggests that his continuing conversation with his incarcerated friend was anything but voluntary. *See Taylor,* 800 F.2d at 1016 (absence of *quid pro quo* and government instructions supported conclusion that informant was not a State agent).

Recently, in State v. Miller, 110 Nev. 690, 877 P.2d 1044 (1994), this court discussed agency in the context of the Fourth and Fourteenth Amendments. In *Miller,* a twelve-year-old baby-sitter suspected illicit drug activity in the home where she was employed. The baby-sitter called 911 and indicated that she had found what she "thought was possibly drugs." *Id.* at 695 n.2, 877 P.2d at 1048. An officer soon arrived at the home and asked, in an effort to confirm or allay the baby-sitter's fears, if he could see what she was calling about. The baby-sitter directed the officer to a bedroom where she secured a grocery bag and handed it to the officer. The officer immediately observed that the bag contained baggies of marijuana. *Id.* at 695-96, 877 P.2d at 1048.

In *Miller,* we recognized that the baby-sitter was acting out of respect for the law and her concern over the possibility of tending small children in an environment where illicit drugs were kept. Moreover, consistent with the instant case, the baby-sitter sought out the police and law enforcement authorities never attempted through any means to elicit her cooperation. *Id.* We concluded:

> It was in the highest tradition of good citizenship when Jennifer [the baby-sitter], despite her fears, had the courage and good sense to summon the police for help in determining whether her suspicions were well-founded. As observed by the Court in [Coolidge v. New Hampshire, 403 U.S. 443, 488-89, *reh'g denied,* 404 U.S. 874 (1971)], it is in no sense the policy of the Fourth or Fourteenth Amendments to discourage citizens from assisting in the apprehension of criminals.

*Id.* (footnote omitted).

On a similar vein, we note that Mike O. contacted the police out of concern for his and his family's safety and after a contemplative discussion with his father. Additionally, we note that the police never attempted to coerce Mike O.'s cooperation; to the contrary, they carefully explained that it was only with his consent that they would proceed with the intercept. As with the Fourth Amendment, the policy of the Sixth and Fourteenth Amendments is not to discourage citizens from assisting in the apprehension of criminals. *See* Coolidge v. New Hampshire, 403 U.S. 443 (1971); *Miller,* 110 Nev. at 696-97, 877 P.2d at 1048-49. For these reasons, we conclude that the district court did not err in determining that Mike O. was not acting as an agent of the police. Having concluded that Mike O. was not an agent of the State, we logically also conclude that Simmons' Sixth and Fourteenth Amendment right to counsel was not violated. *See* Massiah v. United States, 377 U.S. 201 (1964); Emmons v. State, 107 Nev. 53, 807 P.2d 718 (1991).

*Whether the district court's admission of the book "Witchcraft" violated Simmons' Fourth Amendment right to protection from unreasonable searches and seizures.*

Simmons contends that the book *Witchcraft* was illegally seized and should not have been admitted at trial because the book was not listed on the search warrant and neither the plain-view doctrine nor the good-faith exception applies (or has only limited application) to material protected by the First Amendment. Because the satanic themes expressed in *Witchcraft* are protected by the First Amendment and the police did not have any rational nexus between satanism and Jason's death prior to the search, Simmons maintains that the warrant requirement that items to be seized be listed on the warrant should be strictly construed and that the police improperly engaged in the *ad hoc* seizure of the book.

We disagree. The standard for probable cause in seizing material "presumptively protected" by the First Amendment is no higher than any other material. *See* New York v. P.J. Video, 475 U.S. 868, 874-75 (1986). In the instant case, police did not seize the book because its materials were criminal, but rather because the contents of the book were relevant to the crime under investigation. *See* Bennett v. State, 106 Nev. 135, 140, 787 P.2d 797, 800 (1990) (poetry in plain view detailing defendant's desire to kill was lawfully seized). Consequently, we conclude that the district court did not err in finding that the book had evidentiary value and was validly seized pursuant to the plain-view doctrine.

*Whether the district court erred in denying Simmons' motion for a new trial.*

Finally, Simmons contends that the State illegally suppressed evidence of the interview with the victim's neighbor, Bradley, on the morning of the murder. *See* Wallace v. State, 88 Nev. 549, 550, 501 P.2d 1036, 1037 (1972) (State may not withhold evidence that is relevant to the charge and *prima facie* favorable to the accused). Simmons asserts that this evidence would have been reasonably likely to have affected the outcome of the trial. Simmons observes that when Bradley told investigators that he had heard no shots fired the night of the incident, the investigators more vigorously attempted to find a rock, pipe, or other blunt instrument that may have been used to kill Jason. Simmons surmises that this evidence may have had a strong impact on the jury since, during deliberations, the jury directed a question to

the judge concerning whether anyone had heard the dogs barking on the night of Jason's murder. Noting that Jason's father, an experienced veteran, did not smell gun powder at the time of the shooting and that there was no blood splattering which normally occurs with shotgun blasts, Simmons concludes that the jury may have rejected the State's theory that Jason was shot in the Kopack's residence.

The State maintains that Bradley's statement was immaterial because evidence was presented to the jury that the neighbors heard nothing unusual that night. Additionally, the State notes that the physical evidence overwhelmingly indicated that Jason was shot at his residence. There were no blood trails from the large gunshot wound, and when found, the victim was shoeless and wrapped in a blue blanket. Blue fibers matching the blanket were found on the shotgun wadding retrieved from Jason's body, and the lividity in Jason's feet was consistent with death occurring where the body was discovered.

Moreover, the State points to the testimony of Simmons' friends relating Simmons' communications regarding both his murderous plan and the act of killing Jason at his residence. And finally, the State disclaims responsibility for suppressing the evidence where the defendant had access to the same information and, with the exercise of diligence, could have interviewed Bradley before trial. The State emphasizes that the district court properly found that its authorization of investigative funds in the amount of $14,000 was ample for the defense to persevere in its efforts to interview Bradley beyond the two unsuccessful attempts made prior to or during trial.

We conclude that the district court was correct in determining that evidence of Bradley's statements to police claiming to have heard nothing unusual during the period including the time frame of the murder is not sufficient to merit a new trial based on newly discovered evidence. The relevance of such testimony applies only to the question of whether or not Jason was actually killed at his residence. As emphasized by the State, substantial evidence supports the conclusion that Jason was shot at his home. Therefore, we need only note that Bradley's statement, even if deemed to be properly categorized as newly discovered evidence, would not satisfy the requirement that the evidence be of such quality that, when considered by the jury, would probably result in a different outcome upon retrial. *See* Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991).

*Whether there was sufficient evidence to support the jury's guilty verdict.*

We address this subject despite it not being raised as an issue

on appeal, because our dissenting colleague, JUSTICE SPRINGER, concludes that the evidence was insufficient to support Simmons' conviction. We first note, as discussed in some detail in footnote 2, that our colleague seriously errs in concluding that this case stands or falls on the testimony of Mike O. The dissent has simply failed to recognize the corroborating testimony of Dan and Michael B. The combined testimony of these three witnesses alone would constitute sufficient evidence upon which to base a conviction.[5]

The dissent states that Simmons' younger sister testified that on the morning of the murder she saw Simmons, once at 12:30 a.m. and once at 1:30 a.m. The dissent thus concludes that "if Cheryl's story could be accepted," there is no way that Simmons could have driven 30 miles round trip to commit the killing. Unfortunately, the dissent overlooks the fact that Cheryl gave four different versions of her observation of her brother. JUSTICE SPRINGER adopts only the fourth version, a scenario obviously deemed incredible by the jury. Cheryl's first story was that she did not get up at all on the night of February 23rd. Thus, under this version, she could not possibly have seen Simmons at any time relevant to the murder of Jason Kopack. During cross-examination, Cheryl related her second and third versions, which included an admission that she had told a friend that she got up at 2:00 a.m. to get something to eat. The sister then stated that she saw her brother at 1:30 a.m., a rather interesting accomplishment if she did not arise until 2:00 a.m. Thereafter, on re-direct, Cheryl delivered her fourth story of the night's events, namely that she was up at 12:30 a.m. and 1:30 a.m. and saw Simmons on both occasions. The dissent adopted the fourth and final version. In addition to the clear inconsistencies in Cheryl's testimony, the jury may not have been impressed with the thirteen-year-old's story about getting up to put her hamster in the den, and then later arising to get a drink of water, rather than something to eat as earlier stated. It is noted that this was also a school night. In any event, we are unaware of any appellate principle that would permit this court, from the cold record, to elect to disregard the factual findings of the jury in favor of our own.

---

[5]Another telling aspect of Dan's testimony, is that he overheard Simmons tell Mike O. that "he would be paralyzed for sure." Such a statement could strongly infer knowledge of a severe injury to Jason's spinal cord or back, like a shotgun blast to that part of the victim's anatomy. Moreover, Simmons was speaking of such details at about 7:40 a.m., only a little more than an hour and a half after the first officer arrived at the scene of the murder. It is most unlikely that Simmons would have heard any details about the murder, or even the murder itself, at such an early hour. Indeed, Dan testified that he did not find out about the murder until right before noon of that same day.

Our dissenting colleague is also troubled by the fact that David Kopack, Jason's father, and a Vietnam veteran, testified that on the night of the murder he was awakened at 1:23 a.m. by a loud noise which he thought may have been a cat jumping on the roof of the shed next to his bedroom window, or perhaps something else blowing against the shed. Our colleague postulates that a shotgun blast should have been heard by everyone living in such a small place. Noting first that Mr. Kopack was sleeping when he "heard" the noise, it does not appear to be at all unusual that he could not identify the precise noise that awakened him. In any event, the jury could easily have concluded that anyone aroused from a sound sleep by a noise, would have difficulty identifying the precise nature of the sound while in a groggy and confused state of awakening.

Moreover, the dissent notes that after being awakened by the noise, the father walked out into the living room and did not detect the odor of gunpowder. At no time did David Kopack testify that he walked into the living room after being awakened by the noise. At best, his testimony was unclear as to whether he even left his bedroom. He did look out his bedroom window after hearing the noise, but indicated that he did not know whether he went to the front door. Since there was a curtain between the bedroom and the rest of the trailer, that alone may have accounted for Mr. Kopack's failure to smell an odor of gunpowder.[6]

The dissent also views the failure of Sonja Sacks to see tire tracks in the snow in the area of the school where Simmons assertedly parked his mother's car as another basis for concluding that Simmons did not commit the murder. Aside from the fact that Sacks left for work between 4:45 a.m. and 5:15 a.m., when it would have been dark, and that differing intensity of the snow storm could have resulted in tracks left in a light snow that were covered up by a heavier snow, there are other compelling reasons not to credit this aspect of the evidence with the degree of importance attached by the dissenting justice. Ms. Sacks testified that there were two other roads leading to the elementary school where Simmons said he parked his mother's car. She admitted

[6]It would appear that Mr. Kopack was not the most percipient of witnesses. After arising for the day, Kopack testified that he walked over his son's legs three different times to access the coffee machine, the kitchen and his bedroom. The father also testified that after obtaining his cup of coffee, he watched television within a distance of a "few inches, maybe a foot," from Jason; he did not notice the significant bleeding from his son's wounds. The jury may have easily concluded that Mr. Kopack was originally awakened by a shotgun blast that he could not identify because of dulled senses attributable to his sleep-induced state.

that she would not have seen the tire tracks if Simmons had traveled either of the other two streets and parked in the area of the school. Indeed, Ms. Sacks testified that Como road is so close to the elementary school that you could park on the street and walk to the school. The jury could have easily concluded that Simmons' tire tracks were either covered by an incoming heavier snow, or that Simmons took one of the other two streets untraveled by Sacks to arrive at a parking place near the area of the school.

The dissent observes that Simmons' father testified that when he woke up in the morning of the murder, there were no tracks behind either of the two Simmons' cars, and both cars had an equal amount of snow on them. This testimony would tend to undermine the testimony of Mike O. indicating that Simmons told him that he used his mother's car the night of the murder. However, Mike O. also testified that Simmons had told him that he had a little Toyota, but that Mike O. had never seen Simmons drive that car. Thus, Simmons may have driven another car to commit the murder. In any event, the jury could either have disbelieved Mike O. on the testimony concerning the mother's car or may have concluded that Simmons deliberately misled Mike O. with respect to the car he used. The unclear state of the record in this aspect of the evidence is certainly no basis for impeaching the jury's findings. Moreover, the strong corroboration of the evidence supplied by the testimony of Dan and Michael B. must not be minimized.

The dissenting justice does highlight an aspect of Jason's murder that has found no satisfactory answer. The area outside the Kopack's trailer revealed footprints in the snow leading into, but not away from, the trailer. Unless Simmons simply retraced his steps, one would be forced to concede the difficulty in explaining the lack of footprints leaving the trailer absent evidence that the perpetrator remained in the trailer. In the latter case, however, only Jason's father David Kopack would be a suspect in the homicide, a proposition that neither the police, the prosecution, the defense nor the dissenting justice adopts as a viable theory.

Moreover, the evidence against Simmons included a pair of wet tennis shoes found in the Simmons' home the next day, and it was determined that the tread of those shoes matched the tread of the footprints seen in the snow outside the Kopack's trailer.

The dissent next focuses upon the 20-gauge shotgun found in the Simmons' residence, but fails to mention, among his concerns about the weapon, that both Simmons' mother and father testified that the shotgun kept in their closet had not been fired for years. This testimony is highly relevant because investigator Arndell

testified that the shotgun found in the Simmons' closet "smelled like it had been recently fired."[7]

Our dissenting colleague emphasizes, however, that the victim was killed by a Federal factory-loaded, 20-gauge shell as demonstrated by the shell wad removed from Jason's body. The pellets found in the victim's body were size 6. The expended shell in the shotgun recovered from Simmons' home was a Federal factory shell that would have contained size 6 pellets. Dr. Atkinson, the criminalist from the Washoe County Sheriff's Office testified that the wadding and the pellets found in Jason's body were consistent with having come from the expended Federal shell in the Simmons' shotgun. However, the dissent notes that the Federal factory-loaded wad found in the victim should have been fired from a Federal shell that contained a Federal primer. Both State and defense experts agreed that the primer found in the expended shell contained within the chamber of the Simmons' shotgun was not a Federal primer.

Moreover, a defense expert testified that he did not believe that a primer could come out of a Federal factory-loaded shell and be replaced with a non-factory (non-Federal) primer. Based upon the foregoing, our dissenting colleague concludes that the shell in the gun found in the Simmons' closet was not the one that killed Jason. The problem with our colleague's conclusion is that he limits his analysis to the testimony of the defense expert. Prosecution expert Arndell testified that primers can come out of a factory-loaded shell; prosecution investigator Thompson testified that she has seen primers fall out of factory-made shells. Importantly, Arndell also testified that if you are lucky enough to have primers, "you just shove another primer in there and shoot it again."

Based upon the expert testimony of the State's witnesses, the jury could have concluded that Simmons removed the Federal, factory primer, and replaced it with a non-Federal primer. Our colleague has disregarded the conflicting testimony and simply concluded, as a fact found on appeal, that the primer was not switched and could not have been switched, thus giving total credence to the defense expert at the total exclusion of the State's expert witnesses.

---

[7]Our dissenting colleague also contends that another fact weakening the State's case is that Simmons would have had to creep into his parents' bedroom after midnight, remove the shotgun, and then replace it after the murder without waking them on either occasion. Not so. Simmons could have removed the shotgun from the closet sometime before evening and returned it after school the next day. There is no testimony by either the mother or father indicating that they had seen the shotgun in the closet prior to retiring on the evening in question.

We have considered all other issues raised on appeal and conclude that they are meritless and need not be addressed.

## CONCLUSION

For the reasons discussed above, we are convinced that Simmons was fairly tried and convicted, and therefore affirm the judgment entered by the district court in its entirety.

YOUNG, SHEARING, and ROSE, JJ., concur.

## APPENDIX A

The following excerpts of the recorded telephone conversation between Brian Simmons and his friend Mike O. are at issue—the first excerpt is specifically noted by Simmons:

Brian: Yep. I wonder.
Mike: What do you wonder?
Brian: Okay let me ask you a few questions?
Mike: Yeah.
Brian: If you got shot . . . .
Mike: Ahuh.
Brian: And killed with a twenty gauge . . . .
Mike: Ahuh.
Brian: And and bb's went through your lungs, and through your heart into your chest, would you be instantly dead?
Mike: Ah I'd imagine so it [sic] you got shot through the heart?
Brian: Yeah.
Mike: Why?
Brian: Or could you, could you be alive to move like three feet, opposite direction of which you were?
Mike: Probably not cause, anybody who'd get your heart.
Brian: Ahuh, okay good. Then I been framed.
Mike: Huh?
Brian: Then I was framed.
Mike: You were framed?
Brian: Oh yeah.
Mike: *Did Jason move or anything?*
Brian: I don't know I can't tell ya. (Laughter) I was told not to tell anyone anything about the case.
Mike: Oh.
Brian: But I know everything about so, no big deal. That's why I think it's ironic.
Mike: Ironic?

Brian: Ironic.

Mike: So you think you'll be gettin out tomorrow er Thursday?

Brian: Yep.

. . . .

Mike: Are you gonna be able to go to school, if you get out?

. . . .

Brian: Not if I don't want to get mobbed.

. . . .

Mike: Who'd mob you dude?

Brian: *I don't know, do you? . . . . A heartbeat.*

Mike: *Dude there's only a couple of people that know what happened.*

Brian: *What do you mean that know what happened?*

Mike: *That know what happened . . . .*

Brian: There's no one that knows what happened. There's me who knows what happened, there's god who knows what happened.

Mike: Kind of weird to hear you say that.

Brian: And there's satan who knows what too.

. . . .

Brian: Oh I'm readin all the reports and stuff, that's pretty interesting. The coronary reports and stuff like that.

. . . .

Mike: Ah.

Brian: They took the dead body for an autopsy.

Mike: Ah.

Brian: And it's pretty neat.

Mike: *Can you believe he came up clean?*

Brian: *Who?*

Mike: *Jason.*

Brian: *Clean with what?*

Mike: *Huh he had no dope in his system dude.*

Brian: *Bullcrap.*

Mike: *That's what the, the witchmajew.*

Brian: *No way, who said that?*

Mike: *Huh Jenny.*

Brian: What, Jenny's the stupid little, try to get me, dude she's coverin up somethin cause she's tryin to nail me the hardest. Sayin all this stuff like I loved her and I wanted her, and all that.

. . . .

Mike: What a freak.

> Brian: Ah she's a human, I can't I am not surprised. I'm not surprised [sic] one bit. But you know I don't really care, cause I can prove every statment [sic] made against me is false.
>
> Mike: That's cool.

(Emphasis added.)

SPRINGER, J., dissenting:

Simmons' conviction of first-degree murder is based almost entirely on the testimony of his teen-age acquaintance, "Mike," who claims that Simmons admitted to him that he shot and killed Jason Kopack. The problem with Mike's story is that, under the facts as they were unfolded at trial, Mike's story is impossible. Mike claims that Simmons told him that on the night of the murder Simmons walked up to the trailer home where Kopack lived, opened up the door, shot Jason with a shotgun, walked back to his parked car and drove home. The reason that Mike's testimony cannot be true is that there was snow on the ground on the night of the murder; and this fact, in a number of respects, establishes irreconcilable inconsistencies in Mike's story. As an example of such inconsistency, police investigators at the scene were able to trace footprints made in the snow on the night of the murder, which show that some person walked *into* the trailer home, but did not walk *out* of the trailer home. These footprints were the only footprints in the snow that surrounded the Kopack trailer home on the night of the murder. Whoever walked into the trailer home on that snowy night did not walk out, not, at least, until in the morning, after the police investigators completed their investigation of the pristine murder scene. This and other doubts created in my mind by the inconsistency between Mike's rendition of Simmons' confession and the physical evidence at the murder scene prompted me to make a more careful inspection of the record in this case than I might ordinarily have made. After doing this, I came to the conclusion that a jury could not have properly reached a guilty verdict based on proof beyond a reasonable doubt.

As stated, Simmons' conviction is largely based on Mike's testimony about Simmons' supposed admission to Mike about how the murder was committed.[1] Mike testified that Simmons

---

[1]A reading of the record makes it plain that the focus of the prosecution was Mike's detailed account of how Simmons told him that he committed the murder. Mike's testimony together with the prejudicial evidence that Simmons was some kind of budding "Satanist" is what convicted Simmons. The majority tells us that "the conviction could be sustained on the testimony of Dan alone." This is not the case. Dan claims to have come forward only when he read in the paper that his friend Mike's story was being questioned. In his statement to police, Dan claimed that he was sitting near Mike when he

confessed to him that in the early morning hours of the day of the murder he, Simmons, drove his mother's car to a school parking lot that was near where Jason Kopack lived. According to Mike's testimony, Simmons told Mike that when he reached the Kopack residence he sat in the victim's father's car and smoked a cigarette. Then, according to Mike, Simmons said that he walked up to the front door of the trailer home, opened the front door and attempted to shoot the victim with a 20-gauge shotgun that he had gotten from a closet in his parents' bedroom. According to Mike's story, the gun jammed on Simmons' first attempt to shoot Kopack, and Simmons had to load another shell into the gun. Simmons, according to Mike's account of Simmons' confession, was, in a second attempt, able to, and did, in fact, shoot and kill Kopack with the shotgun. Mike also claims that Simmons told him that after he murdered Kopack, he left the trailer home, got into his mother's car and drove back home.

The biggest problem in trying to believe Mike's story is the *snow*. Simmons' father testified that he brushed snow off of both his car and his wife's car (the "murder" car) on the morning following the murder and that both cars had the same amount of snow on them, indicating that neither car had been driven that night. This and the fact that no one, including Simmons, trod out of the Kopack trailer home on the night of the murder tells me that Mike's testimony about Simmons' supposed confession to him is not true.

There are other evidential concerns that cast doubt on the truth of Mike's testimony. The investigator who first found the snowprints at the scene testified that he believed them to have been laid down by Reeboks. Simmons, however, customarily wore combat boots, not Reeboks. Mike accommodatingly testified that Simmons told him that on the particular night of the murder he happened to be wearing Reeboks instead of his usual combat boots. Whether Mike's testimony about what kind of shoes Simmons said he was wearing on the night of the murder is true or not, it is very difficult to tie these footprints in any way to Simmons. The police investigator who discovered the one-way footprints did not bother to photograph or make a mold of the prints. As a consequence, we do not really know what kind of shoe laid down the prints going into the trailer home or what size it was. The officer did go back to the scene, however, after he realized that he should have preserved the footprints; but, by this

overheard Simmons saying that "he did it." Dan was seriously impeached on the witness stand, and this little morsel is hardly of the evidential value that it could have, of itself, sustained the conviction. It was Mike's very damaging and detailed testimony of Simmons' supposed confession that sustained the conviction. Mike's testimony is false, inconsistent and at variance with the physical facts. This is what prompted me to write a dissent in this case.

time, the original prints had been obliterated by the foot traffic of law enforcement personnel and the emergency medical personnel that had responded to the 911 call made by the victim's father. Undaunted, the investigator proceeded to approximate the footprint that he had seen in the snow, and based on this recollection, testified not only that the footprints were Reeboks but that they resembled those of a pair of Reeboks that investigators had found in Simmons' bedroom. Strangely, however, officers found *another* single Reebok lying on the floor of the victim's trailer home, next to the victim's body. I do not know the significance of this find because this shoe has disappeared, and it, like the snowprints, was never photographed. The defense has, understandably, been very much concerned about the disappearance of the Reebok found at the crime scene, as it has about the failure of the police to preserve any evidence as to the nature of the one-way footprints.

If the jury were to believe that Simmons was not wearing his usual combat boots on the snowy night of the murder, and believed Mike's story that Simmons was wearing Reeboks of the kind that the investigators remembered the footprints to resemble, then we arrive at the point where we might suspect that Simmons entered that trailer home on the night of the murder, but never came out. This, of course, would be entirely inconsistent with Mike's story. Another permissible inference would be that the one-way footprints were laid down by some occupant of the trailer home, someone (other than Simmons) who entered the trailer home on that snowy night and remained in the trailer home for the rest of the night.

In my judgment, once we get rid of Simmons' supposed confession to Mike, the prosecution's case collapses, and it becomes impossible for a jury to find guilt beyond a reasonable doubt; still, I will go on to discuss some of the other aspects of this case.

Aside from the police investigator's recollection of what the one-way footprints might have looked like, the only other pieces of evidence that might place Simmons at the murder scene are a cigarette butt found at the scene and an expended shotgun shell seized at Simmons' house.

The only reason that the cigarette butt has any significance in this case is that Mike reported that Simmons smoked a cigarette in the victim's father's car just before the shooting. Even if we were to assume that Mike's testimony about the cigarette butt is true, there is great doubt as to the value of this piece of evidence because, again, the snow enters the picture.

Weather records show that it was either snowing or had just stopped snowing at the time the murder was committed (at an

estimated 1:20 a.m. on February 24, 1994). The cigarette butt was not found by investigators when they first went to the crime scene. On the following day, investigators went back to the scene, deciding to do so because of Mike's statement to them that Simmons said he had smoked a cigarette while outside the Kopack residence on the night of the killing. The State submitted the cigarette butt to DNA testing. DNA tests revealed that eleven percent of the population possessed the kind of epithelial cells that were retrieved from the cigarette butt. For what it is worth, both Simmons and Mike fall within that eleven percent.

If the story Mike related to the deputies were true, Simmons would have to have smoked the cigarette sometime prior to 1:20 a.m. and dropped it on the ground into either the still-falling or recently-fallen snow. The forensic serologist who conducted tests on the cigarette butt testified that traces of saliva would have been removed by contact with moisture or precipitation. According to expert testimony, it is highly probable that any cigarette butt dropped into the snow on the night in question would be so saturated with water on the day following the murder that all traces of saliva and of the epithelial cells from which the DNA was extracted would be gone. This suggests that the cigarette butt in question was dropped or placed at some other, drier time than at the time of the murder. It is entirely possible, if not probable, that the DNA in this case had no connection with Simmons, but, rather, was the DNA of some person who dropped the cigarette after the snow had melted and under circumstances in which the residual saliva on the butt would not have been flushed away. The DNA evidence in this case does not reliably place Simmons at the scene of the crime at the time of the murder.

The only other piece of physical evidence in this case connecting Simmons to the murder scene is a 20-gauge shotgun seized at the Simmons trailer home. The shotgun contained an expended Federal shell in the chamber. This evidence, however, is also problematic. The shell wad recovered from Jason's body came from a factory-loaded 20-gauge shell. The primer in the gun's expended shell, however, was that of a reloaded shell. In fact, every single shell found at Simmons' house was a reloaded shell. Not a single factory-loaded shell was discovered anywhere. The State tried to put together a way in which a non-factory primer might be found in a factory loaded shell; however, an expert witness testified that he did not believe that a primer could have come out of a factory loaded shell and be replaced with a non-factory primer. It is not likely that Jason was killed with a Federal shell which contained a factory wad (which is not distributed to the public for reloading) and a non-factory primer. Thus, it

appears highly probable that the shell in the gun seized at Simmons' house was not the one that killed Jason. Because a shotgun does not leave distinctive markings in the way that other kinds of guns do, ballistics tests on a shotgun would be of no use. What we are left with, then, is the fact that Jason was killed with a 20-gauge shotgun shell and that a 20-gauge shotgun was seized at Simmons' house; but the shell that was in the gun was almost certainly not the shell that expelled the projectiles that killed Jason.[2]

Another fact which casts doubt on the State's theory of this case is the claim that the shotgun had been stored in Simmons' parents' bedroom closet. If this were the case, Simmons would have to have crept into his parents' bedroom after midnight without waking his parents, removed the shotgun and then replaced it when he returned after the shooting. Although it would not be impossible for a teenager to creep, undetected, into his parents' bedroom and remove something from the closet, it seems unlikely in this case. Simmons' mother, Annalea, testified that she suffers from fibromyalgia, a condition which causes her to experience chronic muscular pain. She testified that on the night of the murder she had a particularly restless night, was frequently in and out of bed and had great difficulty sleeping. It seems unlikely, given her fitful condition that night, that Simmons could have retrieved the shotgun from his mother's closet and then returned it without disturbing her or alerting her to his presence.

On the night of the murder, Simmons' mother, Annalea Simmons, was not the only one who was up during the night in the Simmons household. Simmons' younger sister, Cheryl, testified that she got up at least twice (once at 12:30 a.m. and once at 1:30 a.m.), and both times she saw her brother, Brian Simmons, in the living room. If Cheryl's story could be accepted, then there is no way that Simmons could have left his home in Stagecoach (which is fifteen miles away) after 12:30 a.m., gone to the Kopacks' trailer home in Dayton, committed the murder at approximately 1:20 a.m. and been back at his home by 1:30 a.m.

Another weakness in the prosecution's case comes from the testimony of Sonja Sacks, who is a cook at the Dayton schools. She testified that she was the first person to arrive on the morning of February 24 at the school, where Simmons is claimed to have

---

[2]Mike's testimony told of the Simmons family owning a 20-gauge shotgun with Federal shells. What Mike did not know was that the shells were reloads and not of the type that caused Kopack's death. The defense suggested that this is evidence that Mike was trying to use this testimony to "frame" Simmons.

told Mike that he parked his mother's car while he committed the murder. Ms. Sacks saw no tire tracks in the snow at the place where Mike said Simmons told him that he had parked his mother's car on the night of the murder. Again, if Mike's testimony were true, because of the timing of the murder in relation to the snowfall that night, tire tracks should have been observable in the freshly fallen snow at the school. Tire tracks would have been left and thus observable if Simmons had in fact parked the car at the school and then returned from committing the murder by driving the car home in the manner that Mike testified. We have, then, another "snow problem" to add to the prosecution's case.

The prosecution also places some reliance on a drawing which was found in Simmons' school locker. A student told law enforcement officials that Simmons had drawn him a map of a residence that he said he planned to burn down. Five or six days after the student made his statement to the police, Simmons' school locker was secured with a padlock by the Lyon County Sheriff's Office. Later, however, the locker was found to be unsecured, and it is conceded that a number of people knew the combination to the lock on the locker. When a search was finally conducted, some three weeks after the murder, police recovered a crude drawing of a rectangular object which they claimed to be a floor plan of the Kopacks' trailer home. It is entirely possible that the drawing is that of a trailer home floor-plan, but there is nothing from which it can be concluded that this was a drawing of the Kopacks' trailer home. Additionally, other than the fact that it was found in Simmons' locker, there is nothing to connect it to him. The paper does not match that of any of Simmons' notebooks, nor is there any writing on it. The locker was unsecured for five or six days, and anyone could have placed the drawing inside. Even if it had been established that Simmons had drawn a map of some trailer home floor plan, the only claimed purpose for Simmons' drawing of that plan was to facilitate arson, not murder.

Turning again to the circumstances surrounding the night of the murder, it is troublesome that no gunshot or other unusual sounds were heard by anyone in the vicinity of the trailer home on the night of the murder. Kenneth Bradley, a neighbor of the Kopacks, testified that he heard nothing and that his dogs did not bark during the night. Since Bradley's trailer home is situated a mere thirty feet from the Kopacks' trailer home, it seems likely that had a shotgun been discharged at the Kopacks' trailer home, Bradley would have heard it. A videotape made during the initial investigation of the scene contained the sound of Bradley's dogs barking. The only question that the jury asked the court while deliberating was whether anyone had heard the dogs barking on

the night of the murder. No one had. Obviously it appeared to the jury (and it appears to me) that a noise as loud as a shotgun blast would have been noticed by either human or canine. The fact that no one heard the blast is one of many questions that plague the State's case and its theory that Simmons shot Jason Kopack in the living room of Kopack's trailer home on that snowy night.

The only person who testified that he heard anything unusual on the night of the murder was the victim's father, David. David testified that at 1:23 a.m. he heard a noise, which he assumed was a cat jumping on the roof of a shed next to his bedroom window, or perhaps something blowing against the shed. In any event, he got up, walked out into the living room and saw nothing amiss. The Kopacks' trailer home was small, only ten feet by fifty feet. The father's bedroom was down a short hall from the living room, and his bedroom had no door, only a curtain hanging over the opening. It seems that a shotgun blast would necessarily be heard by everyone occupying such a small space. It adds to the consternation to read in the record that David testified that he did not smell any gunpowder when he walked out into the living room. David was a gunner in Vietnam and testified that he was familiar with the smell of gunpowder. It seems very strange that immediately following the discharge of a shotgun in a space as small as the trailer home's living room no one heard the discharge and there was no smell of gunpowder in the confined space of that small trailer home.

As I have pointed out before, the State's case rested primarily on the testimony of the teenager, Mike, who is a far-from-credible witness. Although credibility of witnesses is a determination for the finder of fact, several facts about Mike are worth mention. Mike has been hospitalized for various psychological problems, including drug and alcohol addiction and for having expressed a desire to kill his parents. At the preliminary hearing, Mike testified that he had last used narcotics three weeks prior to the hearing. At trial, he testified that he had used narcotics since the preliminary hearing, some three weeks prior to the trial. Mike also admitted smoking marijuana approximately one week prior to Jason Kopack's death.

At the time of the murder, Mike was on probation with the juvenile authorities because of his drug violations. As a term of his probation, Mike had been required to provide urine samples for testing. Once he became an informant for the State, no one checked him for drug use during the pendency of the case against Simmons. Also, Mike was never brought into court to answer for his admitted drug offenses.

The defense proposes that Mike was the actual murderer and that Mike had a motive to try to frame Simmons. Mike, the

defense proposes, had every reason to try to give the State what it wanted in terms of evidence against Simmons. Mike was frequently in trouble with the authorities, and his friendly cooperation with police authorities in this case arguably gave him an opportunity to get back in the good graces of the police, despite the fact that he admitted to continuous and ongoing drug use.

Finally, with regard to the student who discovered the trailer home sketch, this boy had no apparent motive for fabricating testimony, but it is worth noting that he was Mike's brother's best friend. The student testified further, on behalf of the State's case, that Simmons had talked a lot about murder, mayhem and satanism.[3] But he also testified that he believed that Simmons was all talk, and that his bizarre rantings were a defense to cover up his adolescent insecurities. The student's testimony, by itself, adds little or no convincing evidence of Simmons' guilt in this case.

I understand that it is not the appellate function to interfere with fact-findings made by a jury; however, I approach the evidence in this case as a whole, and everywhere I turn I find inconsistencies and facts that simply are not in harmony with a finding of guilt. I have recounted a wide array of inconsistencies in the State's proof in this case because I believed that I was obligated to make a thorough survey of the record in order to support the uncommon conclusion that this conviction must, as a matter of law, be set aside. My attention, however, is focused on what I have called the "snow problem." It appears to me that when Mike put together his incriminatory account of Simmons' confession, he forgot that the ground was covered with snow on the evening in question and that Simmons' travels, by vehicle and by foot, would be recorded and traceable as long as snow was lying on the ground.

The snow evidence shows that the supposed murder vehicle was not driven by Simmons or anyone else on the night of the murder. The snow evidence shows that no vehicle was driven in the area of the school where Mike claims that Simmons admitted he had parked his mother's car on the night in question. The snow evidence shows that only one person walked in the vicinity of the murder scene and that that one person entered but did not leave the trailer home. This snow evidence tells me that Mike was not

---

[3]The majority mentions Simmons' journals, in which he had copied satanic invocations and written of murder and mayhem. The journals also contained a list of "People to Kill." Simmons explained that this list related to a game of Dungeons & Dragons which he had been playing with Jason, Mike and others. For the most part, the journals simply reiterated Simmons' ramblings about satanism.

telling the truth. Without Mike's *truthful* testimony there can be no conviction in this case.

"The standard of review for sufficiency of the evidence upon appeal is whether, the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt." Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992). In the present case, evidence does not support a finding of guilt beyond a reasonable doubt. It appears that Simmons was convicted on the basis of a theory which was cobbled together by the prosecution out of unreliable and contradictory evidence. No rational trier of fact could have found, beyond a reasonable doubt, based on the evidence in this case, that Simmons was guilty of killing Jason Kopack.

